# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00063-CV

**Texas Department of State Health Services; and Kyle Janek, in his Official Capacity as Executive Commissioner of the Texas Health & Human Services Commission, Appellants**

**v.**

**Marcela Balquinta; Planned Parenthood of Greater Texas Family Planning and Preventative Health Services, Inc.; Planned Parenthood Association of Hidalgo County Texas, Inc.; Planned Parenthood Association of Lubbock, Inc.; Planned Parenthood Association of Cameron and Willacy Counties; Family Planning Associates of San Antonio; Planned Parenthood Gulf Coast, Inc.; and Planned Parenthood of West Texas, Inc., Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT NO. D-1-GN-12-003887, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING

## O P I N I O N

Although this appeal may stem from some broader controversies that have vexed both government and our larger society, our disposition of it ultimately turns on some comparatively narrow questions of judicial jurisdiction and procedure. More specifically, we must consider whether entities that formerly contracted with the State to provide services under a publicly funded health-care program but were subsequently excluded from participating in it and a successor program have constitutional standing—a jurisdictional prerequisite—to challenge their exclusion in the district court. Assuming the entities have standing, we must also consider whether the district court has jurisdiction to decide the particular claims for relief they assert—declaratory-judgment claims under both the Administrative Procedure Act (APA) and the Uniform Declaratory Judgments Act

(UDJA), plus claims for related injunctive relief. We conclude that the district court has jurisdiction of all of the claims except for those asserted under the UDJA.

## BACKGROUND

At the center of this appeal is a State of Texas-funded health benefits program (or succession of programs, to be more precise) commonly known as the "Women's Health Program" (WHP). Under the WHP programs, simply described, participating health care providers have been reimbursed with public funds for furnishing certain reproductive-health and family-planning services to eligible low-income women. But since the WHP's inception in 2005, a key concern of Texas policymakers—and one not unprecedented in regard to the use of public funds for health care-related services at both the state and national levels, nor without controversy—has been to ensure that the program's funds are not used to subsidize elective abortions or the "promotion" of such procedures. Citing this policy goal, in very recent years Texas policymakers have implemented various measures effectively barring from WHP participation several entities, heretofore among the program's largest providers, who are affiliated with the Planned Parenthood Federation of America, operate under "Planned Parenthood" branding, or both. The fallout from these measures has included changes in the way WHP is structured and funded—and the present litigation.

**The "Medicaid WHP"**

The WHP originated as an expansion of Texas's Medicaid program mandated by the Seventy-Ninth (2005) Texas Legislature through its enactment of a new section 32.0248 of the

2

Human Resources Code.[1]  Under Medicaid, created by Title XIX of the Social Security Act, the federal government provides substantial matching funds to states that agree to provide certain specified medical services on behalf of low-income persons, and Texas has participated in the program since 1967.[2]  However, because the WHP would entail coverage of services and clients beyond those for which the federal government normally would provide Medicaid matching funds, the Legislature contemplated that WHP would be operated as a five-year "demonstration project" under 42 U.S.C. § 1315, which permits the U.S. Secretary of Health and Human Services to waive Medicaid's standard parameters—and thereby authorize federal funding—for state-implemented "demonstration projects" employing innovative means to achieve overall Medicaid program objectives.[3]  Consistent with that intent, the Legislature made section 32.0248 effective only until September 1, 2011[4] and directed the Health and Human Services Commission (HHSC), the state agency that administers Texas's Medicaid program,[5] to obtain the required waiver from federal authorities.[6]  The HHS Secretary's delegee, the federal Centers for Medicare and Medicaid Services (CMS), granted Texas the requested waiver for a five-year period beginning effective January 1, 2007, and the "Medicaid WHP" went into operation.

---

[1]  *See* Act of May 30, 2005, 79th Leg., R.S., ch. 816, § 1, 2005 Tex. Gen. Laws 2816, 2817 (codified at former Tex. Hum. Res. Code § 32.0248 (expired Sept. 1, 2011)).

[2]  *See generally Southwest Pharm. Solutions, Inc. v. Texas Health & Human Servs. Comm'n*. No. 03-11-00802-CV, 2013 Tex. App. LEXIS 7815, at *5-7 (Tex. App.—Austin June 27, 2013, no pet.) (summarizing basic features of Medicaid program).

[3]  *See* Act of May 30, 2005, 79th Leg., R.S., ch. 816, §§ 1, 2, 2005 Tex. Gen. Laws at 2817.

[4]  *See id*. § 1(i), 2005 Tex. Gen. Laws at 2818. ("This section expires September 1, 2011.").

[5]  *See* Tex. Hum. Res. Code §§ 32.003, .021.

[6]  *See* Act of May 30, 2005, 79th Leg., R.S., ch. 816, §§ 1, 2, 2005 Tex. Gen. Laws at 2818.

3

Within the enabling statute, specifically subsection (h) of Human Resources Code section 32.0248, the Legislature imposed the following prohibition against the use of WHP funds to subsidize the provision or "promotion" of elective abortions:

> The department shall ensure the money spent under the demonstration project, regardless of the funding source, is not used to perform or promote elective abortions. The department, for the purpose of the demonstration project, may not contract with entities that perform or promote elective abortions or are affiliates of entities that perform or promote elective abortions.[7]

However, HHSC did not enforce these limitations during WHP's initial years beyond requiring compliance with guidelines that had been fashioned in a settlement of prior litigation concerning efforts by the State of Texas to withhold federal funds under Title X of the Social Security Act (as opposed to Medicaid) from Planned Parenthood organizations that performed abortions (the *Sanchez* settlement).[8] To summarize these guidelines, they permitted Planned Parenthood affiliates to access the Title X funds provided they were structured as entities separate from the organization's affiliates that provided abortions. Consequently, a number of entities who were affiliated with the Planned Parenthood organization, operated under "Planned Parenthood" branding, or both—including the entities who are appellees here[9]—were able to participate as providers under the WHP if they were otherwise qualified, did not perform abortions themselves, and were structurally separate from

---

[7] *Id.* § 1(h), 2005 Tex. Gen. Laws at 2818.

[8] *See generally Planned Parenthood of Houston & Se. Tex. v. Sanchez*, 480 F.3d 734, 737 (5th Cir. 2007); *Planned Parenthood of Houston & Se. Tex. v. Sanchez*, 403 F.3d 324, 327-28 (5th Cir. 2005).

[9] To be precise, some of the Planned Parenthood entities who are appellees are successors by merger or consolidation to entities that formerly participated in the WHP. The distinctions between the predecessor and successor entities do not appear to have any substantive significance to our analysis, so we use "the Planned Parenthood entities" as shorthand for both.

the Planned Parenthood affiliates that did. In fact, these Planned Parenthood entities would become some of the WHP's largest providers, with tens of thousands of WHP-subsidized client visits each year, yielding them millions of dollars in WHP reimbursements.

As the expiration of the five-year "demonstration project" drew near, the Eighty-Second (2011) Legislature allowed section 32.0248 of the Human Resources Code to expire by its terms on September 1, 2011, but appropriated funding for the upcoming 2012-13 biennium (September 1, 2011-August 31, 2013) to continue the Medicaid WHP, contingent on CMS's renewal of the Section 1315 waiver.[10] Accordingly, HHSC applied with CMS for a renewed waiver, although the proposed parameters of the program included some services beyond those provided in the original.

In addition to making this contingent appropriation of funds, the Eighty-Second Legislature added a new section 32.024(c-1) to the Human Resources Code imposing restrictions against the subsidization of elective abortions or "promotion" thereof under any continuation of the "demonstration project" or "similar successor program":

> The department shall ensure that money spent for purposes of the demonstration project for women's health care services under former Section 32.0248, Human Resources Code, or a similar successor program is not used to perform or promote elective abortions, or to contract with entities that perform or promote elective abortions or affiliate with entities that perform or promote elective abortions.[11]

---

[10] *See* General Appropriations Act, 2012-13 Biennium, 82d Leg., R.S., ch. 1355, art. II, § 1, 2011 Tex. Gen. Laws 4205, 4228 (Health & Human Servs. Comm'n, Rider 62).

[11] Act of June 27, 2011, 82d Leg., 1st C.S., ch. 7, § 1.19(b), 2011 Tex. Gen. Laws 5390, 5425 (codified at Tex. Hum. Res. Code § 32.024(c-1)).

5

Meanwhile, the Attorney General, upon request of one of the Senators who co-authored the bill that included the new section 32.024(c-1), had issued an opinion determining that *Sanchez* had not limited the State's power to enforce the similar limitations contained in subsection (h) of Human Resources Code section 32.0248.[12] On the same day, responding to a request from the HHSC's Executive Commissioner,[13] then Thomas Suehs, the Attorney General had also opined that the agency possessed statutory authority to promulgate a rule construing "affiliate" as used in the same statute.[14] Against this backdrop, in late August 2011 HHSC proposed,[15] and ultimately adopted effective in March 2012,[16] new administrative rules that defined "promote" and "affiliate" as used in the new section 32.024(c-1) and required all WHP providers to certify compliance or be excluded from participating in the program. It is undisputed that these new rules had the effect of excluding all of the Planned Parenthood entities from continuing to participate as WHP providers.

Facing lost revenues and lost clients who could no longer obtain WHP-subsidized services at their facilities, the Planned Parenthood entities brought suit first in federal court, then in state court, challenging their exclusion from the Medicaid WHP on both constitutional and statutory grounds.[17] They found allies, directly or indirectly, in the federal government, as CMS threatened

---

[12] Tex. Att'y Gen. Op. No. GA-0844 (2011).

[13] The Executive Commissioner is the chief executive of HHSC. *See* Tex. Health & Safety Code § 11.012(e).

[14] Tex. Att'y Gen. Op. No. GA-0845 (2011).

[15] 36 Tex. Reg. 5279-82 (2011) (proposing 1 Tex. Admin. Code §§ 354.1361-.1364).

[16] 37 Tex. Reg. 1696-1701 (2011) (adopting 1 Tex. Admin. Code §§ 354.1361-.1364).

[17] The state court lawsuit is the subject of our opinion and judgment in *Texas Health & Human Servs. Comm'n v. Planned Parenthood of Greater Tex. Family Planning & Preventative*

6

not to renew the Section 1315 waiver in the professed view that HHSC's new rules were inconsistent with federal law governing disbursement of Medicaid funds. Despite the threat of losing federal Medicaid funding for WHP, the State did not yield in its enforcement of the new provider rules, and CMS announced in March 2012 that it was denying renewal of Texas's waiver. However, CMS permitted federal funding to continue under the prior waiver through the end of 2012, at which time the waiver (and with it, the original Medicaid WHP) terminated.

**The TWHP**

In the stead of the Medicaid WHP, HHSC has launched a new "Texas Women's Health Program" (TWHP) similar in scope to the former program but funded entirely with state dollars. In preparation for Medicaid WHP's demise, HHSC secured funding for the TWHP for the remainder of the 2012-13 biennium by obtaining approval from the Governor's Office and Legislative Budget Board, pursuant to appropriations act riders, to transfer, upon termination of the Medicaid WHP, state funds originally appropriated to HHSC for Medicaid WHP and other Medicaid programs to a HHSC subsidiary agency known as the Department of State Health Services (DSHS). Following the budgetary approval, HHSC's Executive Commissioner, by now Kyle Janek, "on behalf of" DSHS, in July 2012 proposed and in October 2012 adopted a new administrative rule (the TWHP rule) reincarnating the WHP as a component of a broader DSHS program known as the "Primary Health Care Services Program."[18] The Primary Health Care Services Program is authorized under chapter 31 of the Health and Safety Code—the "Texas Primary Health Care Services

_____

*Health Servs., Inc.*, No. 03-12-00745-CV, 2014 Tex. App. LEXIS ____ (Tex. App.—Austin Apr. 9, 2014, no pet. h.) (mem. op.), also issued today.

[18] *See* 37 Tex. Reg. 5074-80, 8578-95 (2012) (codified at 25 Tex. Admin. Code §§ 39.31-.45).

Act"—and, as appellees acknowledge, may include "family planning services" among other "primary health care services" DSHS provides under the program.[19] However, in November 2012, DSHS executed an "interagency" contract with HHSC whereby the latter assumed responsibility for the day-to-day operation of the TWHP on DSHS's behalf.

Similar to the administrative rules that had governed the Medicaid WHP, the TWHP rule included provisions that purported to implement Human Resources Code section 32.024(c-1)'s restrictions against subsidization of elective abortions or "promotion" thereof.[20] The following three rule provisions are of particular significance to this appeal:

- 25 Tex. Admin. Code § 39.38, which requires a TWHP provider, on penalty of disqualification from the program, to ensure that it does not perform or "promote" elective abortions;[21] is not an "affiliate of an entity that performs or promotes elective abortions"; "does not use, display, or operate under" the name or branding "of an organization that performs or promotes elective abortions"; and maintains separation between its "TWHP activities and any abortion-performing or abortion-promoting activity" by another entity.[22] Section 39.38 also provides a definition of "promote" that "means advancing, furthering, advocating, or popularizing elective abortion" by means including "furnishing or displaying

---

[19] *See* Tex. Health & Safety Code §§ 31.002(4), .003.

[20] 25 Tex. Admin. Code § 39.31(c)(1), (4) (2013) (Department of State Health Services, Texas Women's Health Program) ("As reflected in several enactments of the Texas Legislature (including, but not limited to, Human Resources Code, § 32.024(c-1)), the TWHP is established . . . to implement the state policy to favor childbirth and family planning services that do not include elective abortion or the promotion of elective abortion . . . [and] to enforce Human Resources Code, § 32.024(c-1), and any other state law that regulates delivery of non-federally funded family planning services."); *see* Tex. Hum. Res. Code § 32.024(c-1).

[21] More specifically, section 39.38 bars providers from both "perform[ing] or promot[ing]" elective abortions outside the scope of TWHP," but specifically prohibits them only from "promoting" elective abortions "within the scope of the TWHP." 25 Tex. Admin. Code § 39.38(b)(1), (2)(A) (2013). A separate section 39.40 provides that TWHP "does not cover . . . counseling on and provision of abortion services" or "counseling on and provision of emergency contraceptives." *Id*. § 39.40(1), (7). Appellees do not challenge section 39.40.

[22] *See id*. § 39.38(a), (b), (d)-(h).

8

to a TWHP client information that publicizes or advertises an elective abortion service provider," or displaying "information that publicizes or advertises an abortion service provider," or "using, displaying, or operating under" branding "of an organization that performs or promotes elective abortions."[23]

- 25 Tex. Admin. Code § 39.33(1), which defines "affiliate" to include an entity "that has a legal relationship with another entity" that is created or governed by one or more written instruments demonstrating "common ownership, management, or control," "a franchise," or the granting of a license or other agreement permitting the use of the other entity's name or branding.[24]

- 25 Tex. Admin. Code § 39.45, which is a "poison pill" provision requiring that "DSHS shall regard th[e] entire [TWHP rules] as invalid and unenforceable and shall cease operation of the program" to the extent Rule 39.33(1), 39.38, or 39.45 itself is held unconstitutional or unenforceable by the courts or its enforcement is otherwise enjoined.[25]

As with the provider restrictions under the Medicaid WHP, there is no dispute that these rule provisions have had the effect of banning the Planned Parenthood entities from participating as providers in the TWHP.

**The present litigation**

As with the Medicaid WHP, the Planned Parenthood entities filed a lawsuit—the one giving rise to this appeal—seeking to overturn the TWHP's provider restrictions and gain access to the new program. Also joining in this suit was Marcela Balquinta, who pleads that she is a WHP enrollee, has previously obtained WHP-covered services at one of the Planned Parenthood entities' facilities, "and desires to continue to do so."

---

[23] *See id.* § 39.38(c).

[24] *See id.* § 39.33(1).

[25] *See id.* § 39.45.

9

In their live pleadings,[26] appellees' central contention is that appellants lack statutory authority to craft the TWHP so as to exclude the Planned Parenthood entities from participation. More specifically, appellees assert that chapter 31 of the Health and Safety Code, the statutory authorization under which the TWHP is being operated by DSHS, does not authorize the exclusion of the Planned Parenthood entities from the program or the program's termination in the event the exclusion is held unenforceable, and that these measures are squarely prohibited by section 12.012 of the Health and Safety Code, which provides that DSHS, "[i]n awarding contracts or grants for services, or in selecting service providers under any program administered by the department, . . . may not discriminate among licensed health care providers who can provide the services under the authority of their licenses."[27] Appellees additionally assert that Human Resources Code section 32.024(c-1), the statute that the challenged rule provisions purport to enforce, is inapplicable to the TWHP, and does not overcome the "discriminat[ion]" prohibition in chapter 12 because (1) the "similar successor program" contemplated by section 32.024(c-1) refers exclusively to a

_____

[26] Appellees' live pleadings consist of an original petition, two supplemental petitions, and a subsequent trial amendment to the original petition made during the hearing preceding the district court's order on appeal.

[27] Tex. Health & Safety Code § 12.012. Appellees also pled that the provider restrictions violated a rider in the General Appropriations Act for the 2012-13 biennium, applicable to DSHS-administered family planning services, stating that an "entity otherwise eligible to receive [DSHS family planning services] funds . . . will not be disqualified from receipt of such funds because of its affiliation with an entity that performs elective abortions (the 'abortion services provider') provided that such affiliation satisfies the terms of the *Sanchez* settlement." General Appropriations Act, 2012-13 Biennium, 82d Leg., R.S., ch. 1355, art. II, § 1, 2011 Tex. Gen. Laws 4177, 4178, 4197-98 (Department of State Health Services, Rider 52). The 2012-13 biennium has since ended, and the General Appropriations Act for the current 2014-15 biennium appropriates funds for TWHP without the limitation of any similar "*Sanchez* rider." Consequently, as appellees acknowledge, their complaints based on this 2012-13 appropriations rider are now moot. *See Dewhurst v. Hendee*, 253 S.W.3d 320, 332-33 (Tex. App.—Austin 2008, pet. dism'd) (expiration of biennium rendered moot claims challenging legality of legislative appropriations for that biennium).

version of the WHP that is a component of the Texas Medicaid program and administered by HHSC, and thus cannot include the current, state-funded incarnation of the program under DSHS; and (2) to the extent TWHP can be considered a "similar successor program" within the meaning of section 32.024(c-1), that statute is rendered "inoperative" by Human Resources Code section 32.002 because it is inconsistent with CMS's expressed view of federal law in refusing to renew Texas's Section 1315 waiver.[28] In the further alternative, appellees contend that, to the extent section 32.024(c-1) is applicable and operative, the other provisions of chapter 32 affirmatively obligate appellants "to give up the exclusion of Planned Parenthood that has resulted in the loss of federal funds, and instead, continue to provide these vital services as a Medicaid program, run by HHSC and funded by the federal government."

Based on these contentions regarding appellants' statutory authority, appellees have asserted two sets of claims for declaratory relief. First, against DSHS, they have asserted claims for declarations that each of the three challenged rule provisions—sections 39.33(1), 39.38, and 39.45—is invalid because it is in excess of and contrary to appellants' statutory authority under chapters 12 and 31 of the Health and Human Services Code and chapter 32 of the Human Resources Code.[29] With respect to these declaratory rule challenges, appellees purport to invoke

_____

[28] Section 32.002 provides:

> If a provision of this chapter conflicts with a provision of the Social Security Act or any other federal act and renders the state program out of conformity with federal law to the extent that federal matching money is not available to the state, the conflicting provision of state law shall be inoperative to the extent of the conflict but shall not affect the remainder of the chapter.

Tex. Hum. Res. Code § 32.002(b).

[29] Appellees additionally sought a declaration that the rule provisions violated the aforementioned 2012-13 appropriations rider, but that claim, again, is now moot.

11

section 2001.038 of the APA, which authorizes "an action for declaratory judgment" against a state agency (here, DSHS) to determine "[t]he validity or applicability of a rule . . . if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff."[30] Additionally, as another basis for invalidating the rule provisions under section 2001.038, appellees have requested declarations that each provision is procedurally invalid for failure to comply with the APA's "reasoned justification" requirement and that there is good cause to void the provisions pending further rulemaking.[31]

Second, appellees have requested declarations under the UDJA that chapters 12 and 31 of the Health and Safety Code and chapter 32 of the Human Resources Code "do not permit Defendants to exclude the Planned Parenthood Plaintiffs from TWHP or to cease to operate TWHP if exclusion of the Planned Parenthood Plaintiffs is held unenforceable."[32] Appellees have asserted their UDJA claims against Commissioner Janek (the Commissioner), in his official capacity. Additionally, liberally construing appellees' pleadings,[33] appellees also assert their UDJA claims against DSHS to the extent the claims come within an internal waiver of sovereign immunity contained in that statute.[34]

---

[30] See Tex. Gov't Code § 2001.038(a), (c).

[31] See Tex. Gov't Code §§ 2001.033, .035, .040.

[32] Similar to their claims under section 2001.038, appellees also sought a declaration based on their now-moot contention that the measures violated the "2011 general appropriations act."

[33] See, e.g., Texas Dep't of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 226 (Tex. 2004) (we construe pleadings liberally in favor of jurisdiction and look to pleader's intent).

[34] Relying on certain changes made by appellees' trial amendment, appellants construe appellees' live pleadings instead to assert the UDJA claims, as well as the claims for injunctive relief, solely against the Commissioner, in his official capacity, and not against DSHS. For reasons that will become apparent below, the distinction ultimately makes little if any difference in

12

Finally, in addition to their declaratory claims, appellees sought temporary and permanent injunctive relief to restrain both DSHS and the Commissioner, in his official capacity, and their agents, employees, or successors, from enforcing the three challenged rule provisions.

Appellants interposed a plea to the jurisdiction as to all of appellees' claims, seeking dismissal based on sovereign immunity and lack of standing, while appellees litigated their request for temporary injunctive relief. Both sides presented evidence relevant to either or both jurisdiction and the propriety of temporary injunctive relief. Following a hearing, the district court denied both appellants' plea to the jurisdiction and appellees' request for a temporary injunction, opining as to the latter that "it is unlikely that [appellees] will succeed at final trial." No findings of fact and conclusions of law were requested or made.

Appellants perfected this appeal to challenge the district court's order denying their plea.[35] Appellees did not perfect an appeal from the district court's order denying their request for temporary injunctive relief.[36] Consequently, only the question of jurisdiction is now before us.

---

our disposition of appellants' jurisdictional challenges. And even if the distinction were otherwise material to our analysis and appellants were correct that appellees have asserted these claims solely against the Commissioner, any jurisdictional defect flowing from appellees' choice to assert the claims against the Commissioner rather than DSHS would be considered readily curable by repleading to name DSHS. *See Texas Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 623 (Tex. 2011) (per curiam) (holding that jurisdictional defect arising from claimants asserting ultra-vires claim against agency rather than state official is considered curable by repleading). To that extent, our analysis of other jurisdictional issues implicating these claims would be relevant to whether any of these claims determined to have been asserted against the wrong defendant could be repled to invoke jurisdiction merely by naming the correct defendant.

[35] *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(8).

[36] *See id*. § 51.014(a)(4).

**ANALYSIS**

In three issues, appellants assert that the district court lacks subject-matter jurisdiction over appellees' claims, and thus erred in overruling appellants' plea, because (1) appellees' claims for UDJA and injunctive relief are barred by sovereign immunity, as redundant remedies, or both; (2) appellees have not satisfied the elements necessary to invoke the district court's jurisdiction through its claim under APA section 2001.038; and (3) appellees lack constitutional standing to assert any of their claims.

**Standard of review**

A plea to the jurisdiction is among the procedural mechanisms through which a party may challenge a trial court's authority to decide the subject matter of a specific cause of action.[37] To determine whether this authority exists, we begin with the contents of the claimant's live pleadings.[38] The claimant has the initial burden of alleging facts that would affirmatively demonstrate the trial court's jurisdiction to hear the cause.[39] Mere unsupported legal conclusions do not suffice.[40] We construe the pleadings liberally in favor of jurisdiction, taking them as true in the

---

[37] *See Miranda*, 133 S.W.3d at 225–26 (Tex. 2004); *see also Harris Cnty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004) (observing that such jurisdictional challenges may also be asserted through other procedural mechanisms, including summary judgment) (citing *San Antonio State Hosp. v. Cowan*, 128 S.W.3d 244, 245 n.3 (Tex. 2004)).

[38] *Miranda*, 133 S.W.3d at 226.

[39] *Id.* (citing *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993)).

[40] *See Creedmoor-Maha Water Supply Corp. v. Texas Comm'n on Envtl. Quality*, 307 S.W.3d 505, 515–16 & nn.7 & 8 (Tex. App.—Austin 2010, no pet.).

first instance, and look to the pleader's intent.[41]  If the pleadings fail to allege sufficient facts to affirmatively demonstrate the trial court's jurisdiction but also fail to affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency, and the plaintiff should be afforded the opportunity to amend.[42]  If, on the other hand, the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiff an opportunity to amend.[43]

We may also consider evidence that the parties have submitted and must do so when necessary to resolve the jurisdictional issues.[44]  Our ultimate inquiry is whether the particular facts presented, as determined by the foregoing review of the pleadings and any evidence, affirmatively demonstrate a claim within the trial court's subject-matter jurisdiction.[45]  That is a question of law that we review de novo.[46]  Although "[a] plea to the jurisdiction is a dilatory plea, the purpose of which is generally to defeat an action 'without regard to whether the claims asserted have merit,'"[47] the required jurisdictional inquiry may nonetheless implicate the merits in some circumstances.[48]

---

[41] *Miranda*, 133 S.W.3d at 226.

[42] *Id*. at 226–27.

[43] *Id*. at 227.

[44] *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000); *Hendee*, 228 S.W.3d at 366.

[45] *See Miranda*, 133 S.W.3d at 226; *Creedmoor-Maha*, 307 S.W.3d at 513, 516 & n.8.

[46] *See Miranda*, 133 S.W.3d at 226.

[47] *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012) (quoting *Bland*, 34 S.W.3d at 554).

[48] *See id*. (citing *Miranda*, 133 S.W.3d at 226); *Hendee*, 228 S.W.3d at 366; *see also University of Tex. v. Poindexter*, 306 S.W.3d 798, 806-07 (Tex. App.—Austin 2009, no pet.)

The district court's jurisdiction to adjudicate appellees' claims is potentially limited by the sovereign-immunity doctrine. Absent Legislative waiver, sovereign immunity deprives Texas courts of subject-matter jurisdiction over any suit against the State or its agencies,[49] such as DSHS. The same immunity generally extends to Texas state officials who are sued in their official capacities, as is the Commissioner here, because that "is merely 'another way of pleading an action against the entity of which [the official] is an agent.'"[50] Consequently, to invoke the district court's subject-matter jurisdiction to adjudicate their claims, appellees had the burden of pleading or presenting facts that would demonstrate their claims either come within a legislative waiver of immunity or avoid implicating immunity in the first instance.

**Standing**

But we will begin by considering appellants' third issue, in which they challenge appellees' standing to assert any of their claims. In this context, "standing" refers to a Texas Constitution-imposed threshold requirement regarding the stake a plaintiff must possess in a dispute before a court can exercise subject-matter jurisdiction to resolve it.[51] The overarching purpose of standing requirements, like other concepts of justiciability, is to "'identify appropriate

---

(explaining differences in standards of review for evidence-based challenges to jurisdictional facts that implicate the merits versus those that do not).

[49] *See, e.g.*, *Sefzik*, 355 S.W.3d at 620–21.

[50] *City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 (Tex. 2009) (quoting *Texas A&M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 844 (Tex. 2007) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985))).

[51] *See Texas Ass'n of Bus.*, 852 S.W.2d at 443–45; *Bacon v. Texas Historical Comm'n*, 411 S.W.3d 161, 174 (Tex. App.—Austin 2013, no pet.).

occasions for judicial action' and thus maintain the proper separation of governmental powers."[52]

"Further, with regard to complaints about governmental action in particular, standing doctrines serve to prevent judicial incursions into abstract or generalized public policy disputes that are properly resolved in the other branches."[53] "They also 'reflect in many ways the rule that neither citizens nor taxpayers can appear in court simply to insist that the government and its officials adhere to the requirements of law . . . because '[g]overnments cannot operate if every citizen who concludes that a public official has abused his discretion is granted the right to come into court and bring such official's public acts under judicial review.'"[54]

Standing under the Texas Constitution requires "a concrete injury to the plaintiff and a real controversy between the parties that will be resolved by the court."[55] The Texas Supreme Court has equated this requirement with the federal test for Article III standing—"A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be

---

[52] *Finance Comm'n of Tx. v. Norwood*, 418 S.W.3d 566, 580 (Tex. 2013) (citing 13 Charles Alan Wright, et al., Federal Practice & Procedure § 3529 (3d ed. 2008)); *see also Bacon*, 411 S.W.3d at 174 ("The [standing] requirement . . . serves to safeguard the separation of powers by ensuring that the judiciary does not encroach upon the executive branch by rendering advisory opinions, decisions on abstract questions of law that do not bind the parties." (citing *Texas Ass'n of Bus.*, 852 S.W.2d at 444)).

[53] *Bacon*, 411 S.W.3d at 174 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 576–78 (1992)).

[54] *Id*. at 174-75 (quoting *Andrade v. Venable*, 372 S.W.3d 134, 136–37 (Tex. 2012) (quoting *Andrade v. NAACP of Austin*, 345 S.W.3d 1, 7 (Tex. 2011); *Bland*, 34 S.W.3d at 555).

[55] *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 154 (Tex. 2012) (citing *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304, 307 (Tex. 2008); *Neeley v. West Orange-Cove Consol. Indep. Sch. Dist.*, 176 S.W.3d 746, 774 (Tex. 2005); *Brown v. Todd*, 53 S.W.3d 297, 305 (Tex. 2001)).

redressed by the requested relief"[56]—and has likewise looked for guidance to the United States Supreme Court's following explication and refinement of that test:

(1)     the plaintiff must have personally suffered an "injury in fact"—an invasion of a "legally protected" interest which is (a) "concrete and particularized," and (b) "actual or imminent, not conjectural or hypothetical";

(2)     "there must be a causal connection between the injury and the conduct complained of"—the injury must be "fairly traceable" to the challenged action of the defendant and not the independent action of a third party not before the court; and

(3)     it must be likely, and not merely speculative, that the injury will be redressed by a favorable decision.[57]

With regard to suits challenging governmental action, the Texas Supreme Court has also observed that "the line between a generalized grievance and a particularized harm . . . varies with the claims made" and that "the proper inquiry" boils down to "whether the plaintiffs sue solely as citizens to insist that the government follow the law."[58]

To establish their standing to assert their claims, the Planned Parenthood entities have alleged and presented evidence to the effect that they are otherwise qualified and able to participate as providers in the TWHP, as they had been under the Medicaid WHP, and that the rule provisions excluding them from the TWHP have, likewise, greatly reduced (if not virtually eliminated) the number of visits they otherwise would receive from TWHP-covered clients and, correspondingly, their revenues. In essence, the entities complain that these provisions burden them

---

[56]  *Heckman*, 369 S.W.3d at 154 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).

[57]  *See id*. at 155-56 (quoting *Lujan*, 504 U.S. at 560-61); *see also Bacon*, 411 S.W.3d at 175.

[58]  *Norwood*, 418 S.W.3d at 580 (quoting *Andrade v. NAACP of Austin*, 345 S.W.3d 1, 7, 8 (Tex. 2011)).

with a competitive disadvantage relative to providers allowed to participate in TWHP because their clients or potential clients who are enrolled in the program enjoy the benefits of coverage (in effect, a form of government subsidy boosting the enrollees' ability to purchase services) only at the competing participating facilities. Although acknowledging that it is theoretically possible TWHP-covered women could chose to patronize the Planned Parenthood entities and pay for the services themselves, the entities have pled and present evidence that this is unlikely as a practical matter because the low-income women eligible to enroll in TWHP typically cannot afford to pay for the services out-of-pocket, or at least cannot afford to pay for the services nearly as frequently as if they had coverage.

Appellants do not dispute that the Planned Parenthood entities have sufficiently demonstrated the injury-in-fact and causal connection components of standing, challenging only whether the entities have demonstrated "redressibility," i.e., that their injury from being excluded from TWHP would be redressed or remedied by a favorable decision on their claims. However, in the context of other jurisdictional challenges that we will address below, appellants have relied upon an analysis of constitutional standing advocated in a Texas Supreme Court case involving a challenge to an exclusion from a governmental health-care funding program with some similarities to the present case. In *Patterson v. Planned Parenthood of Houston and Sw. Tex., Inc.*, a Planned Parenthood affiliate asserted constitutional challenges to a state appropriations rider prohibiting the expenditure of family-planning services funds to dispense prescription drugs to minors without parental consent.[59] Although all nine justices of the Texas Supreme Court joined in

---

[59] 971 S.W.2d 439 (Tex. 1998); *id.* at 444 (Gonzalez, J., concurring).

19

dismissing the suit for lack of ripeness,[60] two concurring justices opined further that, in their view, the Planned Parenthood entity also lacked constitutional standing to bring its suit.[61] The gravamen of the *Patterson* concurrence is that the statutory health-care spending programs at issue created legal rights or entitlements only for the individual citizens whom the programs were intended to benefit, while the service providers paid by the State to deliver the services had no constitutional, statutory, or common-law right to benefit from "state subsidization" or from any particular method of administering the program.[62]

While appellants do not rely upon the *Patterson* concurrence in regard to constitutional standing, they have urged us to follow its reasoning in holding that appellees have failed to assert a claim that invokes section 2001.038 of the APA, which requires allegations of an existing or threatened infringement or impairment of a "legal right or privilege" of the claimant.[63] In appellants' view, "[c]onstitutional standing," correctly viewed, "is broader than the cause of action outlined by § 2001.038, which is limited to rights and privileges," and it is only on that latter issue that they regard the *Patterson* concurrence to be persuasive authority. But inasmuch as the *Patterson* concurrence itself frames its analysis in terms of constitutional standing, it would tend to raise questions as to whether the Planned Parenthood entities have satisfied the injury-in-

---

[60] *See id*. at 443-44; *id*. at 444 (Gonzalez, J., concurring).

[61] *See id*. at 444-47 (Gonzalez, J., concurring).

[62] *See id*. at 444-46 (Gonzalez, J., concurring).

[63] *See* Tex. Gov't Code § 2001.038(a).

fact and causation elements here. Accordingly, we conclude that we should address those possible implications sua sponte.[64]

As is perhaps clearer to Texas courts today than at the time *Patterson* was decided, the "injury-in-fact" to a "legally protected interest" required for constitutional standing is distinct from, and does not require, the sort of infringement to a vested right or other *legal* injury (i.e., a viable cause of action based on the deprivation of a right or interest) that the *Patterson* concurrence seemingly would have required.[65] Instead, as appellants have aptly (and candidly) explained in their brief, "[c]onstitutional standing extends to any allegation of [particularized] harm and is not limited to interference with a legal right." For example, in its recent *Norwood* decision, the Texas Supreme Court held that the interests of homeowners in seeking future home equity loans—an economic interest far short of a legal or vested right—was, under the circumstances presented, sufficient to confer standing to challenge administrative rules governing the fees that lenders could charge on such loans.[66] Similarly, we have recognized that even in the absence of vested rights or other legal entitlements to future transactions, a business can have standing to challenge the legality of governmental actions based on pleadings or proof that the actions impose regulatory burdens, damage or destroy markets for its services, or impede business opportunities.[67] The asserted interest

---

[64] *See Norwood*, 418 S.W.3d at 580 ("Because standing is required for subject-matter jurisdiction, it can be—and if in doubt, must be—raised by a court on its own at any time.") (citing *Texas Ass'n of Bus.*, 852 S.W.2d at 445-46).

[65] *See Stop the Ordinances Please v. City of New Braunfels*, 306 S.W.3d 919, 926-27, 929 (Tex. App.—Austin 2010, no pet.) (hereinafter *STOP*). *Cf. Patterson*, 971 S.W.2d at 445-46 (Gonzalez, J., concurring).

[66] *See Norwood*, 418 S.W.3d at 583-84.

[67] *See STOP*, 306 S.W.3d at 928-29 (citing *Lake Medina Conservation Soc'y v. Texas Natural Res. Conservation Comm'n*, 980 S.W.2d 511, 516 (Tex. App.—Austin 1998, pet. denied);

21

of the Planned Parenthood entities here are of a similar nature—the State of Texas has effectively

banned them from competing in a State-created market of health-care consumers whose purchases

are subsidized by the TWHP. Moreover, we observe that federal courts, including those in Texas,

have frequently exercised jurisdiction over suits initiated by Planned Parenthood-related entities

challenging their exclusion from state health-care reimbursement programs without any suggestion

that the providers lack standing[68] (which, as under Texas law, is considered to be a jurisdictional

issue subject to being raised sua sponte[69]). We conclude, as appellants themselves evidently have,

that the Planned Parenthood entities have satisfied the injury-in-fact and causation components of

constitutional standing.

        Turning now to the redressibility component of standing, appellants argue that the

Planned Parenthood entities cannot satisfy this requirement because the relief they seek would not

remedy their injury from being excluded from the TWHP, but would instead have the legal effect

---

*Texas Rivers Prot. Ass'n v. Texas Natural Res. Conservation Comm'n*, 910 S.W.2d 147, 151-52 (Tex. App.—Austin 1995, writ denied); *National Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 281-84 (6th Cir. 1997); *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 61 (9th Cir. 1994)). *Cf. Bacon*, 411 S.W.3d at 176 (observing that plaintiffs' mere "subjective interests or concerns" in the content of a Texas historical marker placed by the Texas Historical Commission are common to members of the general public and "are not in themselves considered to rise to the level of a justiciable interest that can support standing in court," but "merely signal an impetus for the democratic political participation . . . through the Legislative and Executive branches").

    [68] *See, e.g.*, *Planned Parenthood Ass'n of Hidalgo Cnty. Tex., Inc. v. Suehs*, 692 F.3d 343 (5th Cir. 2012); *Planned Parenthood of Mid-Mo. and E. Kan., Inc. v. Dempsey*, 167 F.3d 458 (8th Cir. 1999); *Planned Parenthood of Cent. & N. Arizona v. State of Ariz.*, 789 F.2d 1348 (9th Cir. 1986); *Planned Parenthood of Cent. N.C. v. Cansler*, 877 F. Supp.2d 310 (M.D.N.C. 2012); *Planned Parenthood Greater Memphis Region v. Dreyzehner*, 853 F.Supp.2d 724 (M.D. Tenn. 2012); *Planned Parenthood of Kan. and Mid-Mo. v. Brownback*, 799 F. Supp.2d 1218 (D. Kan. 2011).

    [69] *See, e.g.*, *Doe v. Tangipahoa Parish Sch. Bd.*, 494 F.3d 494, 496 n.1 (5th Cir. 2007) (en banc) ("Standing is a jurisdictional requirement and not subject to waiver. A federal court must consider its jurisdiction sua sponte.") (internal citations omitted).

of terminating the TWHP altogether. In support, appellants primarily emphasize the "poison-pill" provision in section 39.45 of the TWHP rule, which, as previously noted, would require DSHS to "cease operation of the program" and deem the entirety of the rule "invalid and unenforceable" to the extent section 39.33(1) (the "affiliate" definition), section 39.38 (the prohibition against elective abortions or "promotion" thereof by TWHP providers or "affiliates"), or section 39.45 itself is struck down or its enforcement is enjoined.[70] In response, the Planned Parenthood entities point out that they have asserted claims challenging the validity of the poison-pill provision itself, and that if they prevail, the mechanism will be invalidated, thereby satisfying the redressibility component of standing. They similarly suggest that to the extent appellants are asking us to decide the validity of the poison-pill provision at this juncture, appellants have strayed beyond the threshold standing inquiry into seeking a premature adjudication of the merits of appellees' claim challenging it. We agree with the Planned Parenthood entities that the existence of the poison-pill provision, whose legality they are challenging and would eliminate if successful, does not in itself negate the redressibility element of their constitutional standing.[71]

Appellants further contend that, even apart from the poison-pill mechanism, the Planned Parenthood entities' claims would have the effect of terminating the TWHP by operation of the APA. This is so, appellants insist, because if the entities prevail in any of their section 2001.038 claims, the remedy prescribed by the APA is to invalidate the entirety of the TWHP rule, and effectively the whole program, not merely the specific provisions that appellees have challenged. Appellants reason that (1) the APA defines a "rule" in terms of a "state agency

---

[70] *See* 25 Tex. Admin. Code § 39.45.

[71] *See Bland*, 34 S.W.3d at 554 (noting general rule that a plea to the jurisdiction "should be decided without delving into the merits of the case").

23

statement of general applicability,"[72] (2) the TWHP rule, though it contains multiple provisions, was promulgated as a single "statement of general applicability," and, therefore, is a single "rule" under the APA, and (3) APA section 2001.038 authorizes suits for declarations as to the "[t]he validity or applicability of a *rule*," and does not explicitly refer to individual provisions within a "rule." From these propositions, appellants conclude that section 2001.038 precludes "piecemeal" or "section by section" invalidation of individual provisions within the TWHP rule and instead requires that if any component provision of the rule is found invalid, the entirety of that enactment—and with it, the entirety of the TWHP—must fall. In essence, appellants view an APA rule challenge as an all-or-nothing proposition that would wipe out any other rule provisions contained within the same enactment.

Assuming without deciding that the multi-provision TWHP rule must be considered but a single "rule" for these purposes, we need only observe that APA rule challenges are subject to the Code Construction Act's general principle that any portions of an enactment held invalid are deemed severed and the remaining portions are given effect.[73] Although appellants point out that this general presumption of severability must yield to an express non-severability provision,[74] the sole non-severability provision to which they can refer us is the challenged poison-pill provision of section 39.45. Consequently, appellants' challenge to redressibility based on the APA, as with their

---

[72] *See* Tex. Gov't Code § 2001.003(6) ("'Rule': (A) means a state agency statement of general applicability that: (i) implements, interprets, or prescribes law or policy; or (ii) describes the procedure or practice requirements of a state agency; (B) includes the amendment or repeal of a prior rule; and (C) does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedure.").

[73] *See id*. § 311.032(c); *see also id*. § 311.002(4) ("This chapter applies to: . . . each rule adopted under a code.").

[74] *See id*. § 311.032(b).

24

challenge in reliance on the poison-pill provision, ultimately goes to the merits of the Planned Parenthood entities' claims rather than their standing to assert them.[75]

Whatever the merits of their claims might ultimately prove to be, the Planned Parenthood entities have sufficiently demonstrated the minimum threshold interest that confers standing under the Texas Constitution to assert the claims in court. And because Balquinta, the sole remaining plaintiff, asserts the same claims for relief as do the Planned Parenthood entities, we need not decide whether she has independently demonstrated her own constitutional standing.[76] Accordingly, we overrule appellants' third issue.

**Declaratory relief under APA section 2001.038**

In their second issue, appellants assert that appellees' claims for declaratory relief under section 2001.038 of the APA are barred by sovereign immunity. They acknowledge that section 2001.038 authorizes "an action for declaratory judgment" against a state agency—thereby waiving sovereign immunity—to the extent of determining "[t]he validity or applicability of a rule . . . if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff."[77] However, they dispute

---

[75] *See Bland*, 34 S.W.3d at 554.

[76] *See Andrade*, 345 S.W.3d at 6 ("Because the [plaintiffs] seek only declaratory and injunctive relief, and because each [plaintiff] seeks the same relief, only one plaintiff with standing is required.") (citing *Barshop v. Medina Cnty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 627 (Tex. 1996)).

[77] *See* Tex. Gov't Code § 2001.038(a), (c); *see also Texas Dep't of Transp. v. Sunset Transp., Inc.*, 357 S.W.3d 691, 700 (Tex. App.—Austin 2011, no pet.) ("APA section 2001.038 waives sovereign immunity to the extent of creating a cause of action for declaratory relief regarding the 'validity' or 'applicability' of a 'rule' if 'it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff.'").

25

whether appellees have pled or presented evidence of any interest on their part that would constitute a "legal right or privilege" that is being interfered with or impaired, or is threatened to be, by the challenged rule provisions. In support, appellants rely on the concurring opinion in *Patterson v. Planned Parenthood*.[78] Appellants reason that even if the *Patterson* concurrence does not correctly reflect constitutional standing concepts as currently viewed by the Texas Supreme Court, it is nonetheless instructive regarding the nature of a "legal right or privilege" that the Legislature contemplated in section 2001.038, which appellants perceive to be a narrower concept.

The analytical linchpin of appellants' argument—the notion that the interference with or impairment of a "legal right or privilege" contemplated by APA section 2001.038 is narrower than constitutional standing requirements—has recently been rejected by the Texas Supreme Court. In *Norwood*, while analyzing the homeowners' constitutional standing to challenge, under APA section 2001.038, administrative rules governing fees charged on home-equity loans, the supreme court made the following observation regarding that statute's "legal right or privilege" requirement:

> The [agency's] authority to interpret Section 50 is subject . . . to the Administrative Procedure Act, which permits judicial review of a rule adopted by a state agency "if it is alleged that the rule or its threatened interpretation interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff." The Homeowners' pleadings track this language and thus allege the injury required by the Act for judicial review. The Act does not purport to set a higher standard than that set by the general doctrine of standing, and it cannot be lower, since courts' constitutional jurisdiction cannot be enlarged by statute. We treat the Act's requirement as but another expression of the general doctrine of standing.[79]

---

[78] 971 S.W.2d at 445-46 (Gonzalez, J., concurring).

[79] *Norwood*, 418 S.W.3d at 582 n.83 (internal citations omitted).

26

Appellants urge that the foregoing discussion from *Norwood* should be viewed as addressing only whether APA section 2001.038 imposes a statutory "standing" requirement, in so many words, that deviates from constitutional standing concepts. Such a question of statutory "standing," they add, is different from their jurisdictional challenge here, which they characterize as going instead to whether appellees have alleged or proven facts sufficient to invoke the waiver of sovereign immunity in section 2001.038. But while it is true that standing and sovereign immunity are distinct jurisdictional concepts, it remains that appellants' "sovereign immunity" challenge is rooted in the same "legal right or privilege" language that the *Norwood* court concluded, contrary to appellants' view, "does not purport to set a higher standard than that set by the general doctrine of standing."[80] Additionally, we observe that the *Norwood* court did not characterize this issue as one of statutory "standing," but analyzed it in the more general terms of "the injury required by [APA section 2001.038] for judicial review,"[81] phraseology that equally contemplates a requirement for invoking the statute's waiver of sovereign immunity so as to permit "judicial review" of the challenged rules.[82] Nor would any such labels be significant, in our view, given that the Texas Supreme Court considers sovereign immunity to implicate subject-matter jurisdiction—and to be susceptible of being raised for the first time on appeal—just as with standing issues.[83]

---

[80] *See id.*

[81] *See id.*

[82] *Cf. Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 198 (Tex. 2004) ("independent right to judicial review in section 2001.171 of the APA . . . provides a limited waiver of sovereign immunity").

[83] *See Rusk State Hosp. v. Black*, 392 S.W.3d 88, 95-96 (Tex. 2012); *see also Texas State Bd. of Veterinary Med. Exam'rs v. Giggleman*, 408 S.W.3d 696, 707 n.18 (Tex. App.—Austin 2013, no pet.) (observing that *Rusk* implies that sovereign immunity, like other jurisdictional issues, may be raised by an appellate court sua sponte).

Although it is conceivable that the Texas Supreme Court might have more to say regarding these apparent ramifications of *Norwood*—perhaps even on review of this opinion and judgment—we are bound to follow the high court's existing precedents, and we cannot conclude that the above-quoted language leaves room for lower courts to conclude that the existing or threatened interference or infringement with a "legal right or privilege of the plaintiff" required by APA section 2001.038—whether viewed in terms of "standing" under that statute or of the sufficiency of pleadings or proof required to invoke the statute's waiver of sovereign immunity—is "a higher standard than that set by the general doctrine of standing." Accordingly, we must reject appellants' assertions to that effect. And, having concluded that appellees collectively have demonstrated constitutional standing to assert their claims, it follows that they have alleged an existing or threatened interference or infringement with a "legal right or privilege" as section 2001.038 requires.

Appellants do not otherwise dispute that appellees have satisfied section 2001.038's requirements. Indeed, appellees have asserted, as section 2001.038 requires, "an action for declaratory judgment" against DSHS, to determine the validity of three rules of that agency, and have alleged that each rule interferes with or impairs interests that are considered to be "a legal right or privilege" of theirs.[84] Consequently, section 2001.038 waives DSHS's sovereign immunity as to these claims for relief,[85] and the district court possesses subject-matter jurisdiction to adjudicate the claims' merits. Accordingly, we overrule appellants' second issue.

---

[84] *See* Tex. Gov't Code § 2001.038(a), (c).

[85] *Sunset Transp., Inc.*, 357 S.W.3d at 700.

28

**Declaratory relief under the UDJA**

Within their first issue, appellants challenge the district court's jurisdiction over the claims appellees assert under the UDJA, urging that the claims are barred by sovereign immunity and as seeking a remedy "redundant" of that provided by their section 2001.038 claims.

While APA section 2001.038 authorizes declaratory relief regarding the "validity or applicability" of agency rules, the UDJA permits "[a] person . . . whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise [to] have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder."[86] Appellees have unquestionably asserted claims within the UDJA's general scope—they seek declarations that chapters 12 and 31 of the Health and Safety Code and chapter 32 of the Human Resources Code "do not permit Defendants to exclude the Planned Parenthood Plaintiffs from TWHP or to cease to operate TWHP if exclusion of the Planned Parenthood Plaintiffs is held unenforceable." But a trial court's jurisdiction to grant such relief under the UDJA is much narrower than with claims under section 2001.038. The UDJA does not provide a general waiver of sovereign immunity for claims within its scope, only a limited waiver encompassing, of chief importance here, claims against the State or its agencies to challenge the "validity" of a statute.[87] Otherwise, the UDJA does not alter the scope of a trial court's jurisdiction, but is "merely a procedural device for deciding cases already

---

[86] Tex. Civ. Prac. & Rem. Code § 37.004(a); *see also Giggleman*, 408 S.W.3d at 708 (observing that claim concerning "the proper construction of the [agency's] rules, as opposed to a statute . . . falls outside the UDJA altogether" and observing that it is instead APA section 2001.038 that authorizes declaratory suits concerning the "validity or applicability" of rules).

[87] *See Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 633-34 (Tex. 2010); *Heinrich*, 284 S.W.3d at 373 n.6.

29

within a court's jurisdiction."[88]  Consequently, a UDJA declaratory claim asserted directly against a state agency or official, like other types of claims, will ordinarily be barred by sovereign immunity, thereby divesting the trial court of jurisdiction, unless the Legislature has waived immunity as to the subject matter of the claim.[89]

Furthermore, "a litigant's couching its requested relief in terms of declaratory relief does not alter the underlying nature of the suit,"[90] such that a UDJA claim that might otherwise be within a court's jurisdiction will be independently barred by sovereign immunity if it "has the effect of establishing a right to relief against [a governmental entity] for which the Legislature has not waived . . . immunity."[91]  For example, sovereign immunity bars a UDJA claim that would have the effect of challenging an agency order that has not been made reviewable by statutory or constitutional provisions.[92]  Similarly, the "redundant remedies" concept that appellants invoke, as applicable here, holds essentially that where a claimant has invoked a statutory means of attacking an agency order, a trial court lacks jurisdiction over an additional claim under the UDJA that would merely determine the same issues and provide what is substantively the same relief that would be

---

[88] *Texas Parks & Wildlife Dep't v. Sawyer Trust*, 354 S.W.3d 384, 388 (Tex. 2011) (quoting *Texas Ass'n of Bus.*, 852 S.W.2d at 444); *see Texas Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002).

[89] *Sefzik*, 355 S.W.3d at 622.

[90] *Sawyer Trust*, 354 S.W.3d at 388 (citing *Heinrich*, 284 S.W.3d at 370-71; *IT-Davy*, 74 S.W.3d at 855).

[91] *Id*. (citing *City of Houston v. Williams*, 216 S.W.3d 827, 828-29 (Tex. 2007) (per curiam)).

[92] *See Creedmoor-Maha*, 307 S.W.3d at 515.

provided by the other statutory remedy.[93] Consequently, even if a claimant asserts an otherwise-valid UDJA claim challenging whether an agency is acting within its statutory authority, the claim is deemed to be barred jurisdictionally as "redundant" of a pending APA section 2001.038 claim to the extent the official actions from which relief is sought consist of the agency's promulgation or application of a rule.[94] Conversely, the UDJA claim would not be considered redundant of a section 2001.038 claim to the extent it challenges official actions other than a rule or its application.[95]

Appellants insist that appellees's UDJA claims are entirely redundant of their claims under APA section 2001.038. In response, appellees agree that "they may not pursue a UDJA claim wholly redundant of the APA rule challenge," but explain that their intent is to seek "non-redundant UDJA relief" to the extent appellants "contend they have duty or discretion, independent of the challenged TWHP rule sections based solely on Human Resources Code § 32.024(c-1), to exclude Planned Parenthood providers from TWHP or to terminate TWHP if the exclusion is held unlawful." However, appellees acknowledge that it is "unclear" whether appellants have asserted such a fallback

---

[93] *See, e.g.*, *Texas Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 199-200 (Tex. 2007) (citing *BHP Petroleum v. Millard*, 800 S.W.2d 838, 841 (Tex. 1991); *Texas Liquor Control Bd. v. Canyon Creek Land Corp.*, 456 S.W.2d 891, 895 (Tex. 1970)); *Sunset Transp., Inc.*, 357 S.W.3d at 705 (citing *Texas Mun. Power Agency*, 253 S.W.3d at 200; *Strayhorn v. Raytheon E-Sys., Inc.*, 101 S.W.3d 558, 572 (Tex. App.—Austin 2003, pet. denied); *Young Chevrolet, Inc. v. Texas Motor Vehicle Bd.*, 974 S.W.2d 906, 911 (Tex. App.—Austin 1998, pet. denied); *Ben Robinson Co. v. Texas Workers' Comp. Comm'n*, 934 S.W.2d 149, 153 (Tex. App.—Austin 1996, writ denied)). *Cf. Cobb v. Harrington*, 190 S.W.2d 709, 714 (Tex. 1945) (observing that mere existence of adequate alternative legal remedy does not ordinarily foreclose use of UDJA to obtain relief).

[94] *See Sunset Transp., Inc.*, 357 S.W.3d at 700, 705; *Texas Dep't of Pub. Safety v. Salazar*, 304 S.W.3d 896, 906 n.7 (Tex. App.—Austin 2009, no pet.).

[95] *See Sunset Transp., Inc.*, 357 S.W.3d at 705-06; *Salazar*, 304 S.W.2d at 905.

position as of yet, and ultimately can offer no more than between-the-lines speculation regarding an appropriations rider[96] and a statement by the former Commissioner[97] that, in their view, imply that the State and its agents "think that, somewhere unspecified in existing law, an HHSC Commissioner has some yet unspecified source of discretionary power to create a family planning program that excludes Planned Parenthood and to terminate that program if Planned Parenthood cannot be excluded from it—even if the challenged rule parts are invalid." They further posit that absent a "binding judicial admission" by appellants "that, if Appellees prevail on their APA rule challenges, Appellants can neither exclude Planned Parenthood providers from TWHP nor terminate TWHP based on the exclusion being unlawful," the district court should be held to have jurisdiction at this juncture and "be allowed to sort this out."

In reply, appellants urge that appellees' own description of their claims for "non-redundant UDJA relief" reveals any such claims not yet to be ripe for resolution,[98] and thus warranting dismissal. We agree that, at least as appellees have framed the controversy that underlies

---

[96] Appellees point to a rider to the Legislature's appropriation to fund TWHP for the current biennium stating that "[c]ontingent upon a decision by [HHSC] or other authorized health and human services agency listed under Chapter 531, Government Code [which would include DSHS, *see* Tex. Govt. Code § 531.001(4)(B)], to cease operation of the program funded in Strategy D.2.3, Texas Women's Health Services [i.e., the TWHP]," any unexpended funds will be transferred by HHSC to DSHS for Strategy B.1.4., "Community Primary Care Services." *See* General Appropriations Act, 2013-14 Biennium, 83d Leg., R.S., ch. 1411, art. II, § 1, 2013 Tex. Gen. Laws 3931, 3983 (Health & Human Services Commission, Rider 51). Appellees' live pleadings do not yet contain any allegations regarding this appropriations rider, but we nonetheless consider it in our analysis inasmuch as appellees could add such allegations by repleading.

[97] Appellees emphasize that in March 2012, then-Commissioner Suehs stated that, following the demise of the Medicaid WHP, the agency "will not introduce a similar successor program unless otherwise directed by the Legislature," yet HHSC (under Commissioner Janek) launched the TWHP later that year.

[98] *See, e.g.*, *Patterson*, 971 S.W.3d at 444.

their claims for "non-redundant UDJA relief," appellees have thus far alleged no more than "uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all," not a ripe claim challenging official actions extending beyond the challenged rules.[99] That is to say, appellees have not asserted any ripe UDJA claims that are not redundant of their section 2001.038 claims. To this extent, we sustain appellants' first issue and dismiss appellees' UDJA claims. We note, however, that our dismissal is without prejudice to appellees reasserting non-redundant claims for UDJA relief should a justiciable controversy in that regard later arise.[100]

Because these holdings are dispositive of the district court's jurisdiction over appellees' UDJA claims as they currently exist, we do not reach whether they are independently barred by sovereign immunity.[101]

**Injunctive relief**

But we overrule the remainder of appellants' first issue, which addresses appellees' claims for injunctive relief. At the present juncture, appellees seek only permanent injunctive relief to restrain appellants from enforcing any of the challenged rule provisions that the district court declares invalid under APA section 2001.038 upon final trial.[102] Appellees explain that this remedy is grounded in chapter 65 of the Civil Practice and Remedies Code and general principles of

---

[99] *Id.*

[100] *See Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 853 (Tex. 2000); *Save Our Springs Alliance v. City of Austin*, 149 S.W.3d 674, 685 (Tex. App.—Austin 2004, no pet.).

[101] *See* Tex. R. App. P. 47.1.

[102] Appellees acknowledge that, having not appealed from the district court's order denying their request for temporary injunctive relief, that claim "is now moot" and that only their claim for permanent injunctive relief remain live and justiciable.

33

equity,[103] but that the district court's jurisdiction to award it derives from either of two underlying causes of action created by other law.[104] The first, appellees explain, is the cause of action for declaratory relief and accompanying waiver of sovereign immunity provided by section 2001.038 of the APA. The second is the common-law "ultra vires" cause of action, whereby a claimant can effectively sue the State by suing, in his or her official capacity, a state official who is the decisionmaker for the relevant agency (thereby binding the State through its agent) for prospective relief to compel compliance with statutory or constitutional provisions.[105] Sovereign immunity is held not to bar such claims because, in theory, acts that are not lawfully authorized, which are attributed to the state official for these purposes, are not considered to be acts of the State or the agency itself, and the remedy of compelling the "official" to comply with the law, while binding on the State, "do[es] not attempt to exert control over the state [but] attempt[s] to reassert the control of the state."[106] Reflecting the conceptual and procedural differences in the underlying causes of action on which they rely, appellees have asserted their claims for injunctive relief against both (1) DSHS, in the view that section 2001.038 itself authorizes such relief or otherwise waives sovereign immunity to permit it; and (2) the Commissioner, in his official capacity, in the view that a section 2001.038 declaration invalidating the challenged rule provisions would mean that any

---

[103] *See* Tex. Const. art. V, § 8; Tex. Civ. Prac. & Rem. Code §§ 65.001-.045.

[104] *See Etan Indus., Inc. v. Lehmann*, 359 S.W.3d 620, 625 n.2 (Tex. 2011) (explaining that permanent injunctive relief is not itself a cause of action, but a remedy "available only if liability is established under a cause of action" (citing *Valenzuela v. Aquino*, 853 S.W.2d 512, 514 n.2 (Tex. 1993)).

[105] *See Heinrich*, 284 S.W.3d at 372–80.

[106] *Id*. at 372.

continued enforcement of the provisions would exceed and violate DSHS's statutory authority and, therefore, be subject to restraint through an ultra-vires claim.

Appellants insist that the district court lacks jurisdiction to award injunctive relief under either theory. Their core contention is that the declaratory-judgment remedy provided in APA section 2001.038 is intended to serve as the sole remedy in any suit challenging the "validity or applicability" of a rule. Appellants emphasize that section 2001.038 refers only to "an action for declaratory judgment" and makes no explicit mention of injunctive relief.[107] From these statutory features, appellants deduce both that (1) section 2001.038 itself does not provide for injunctive relief, much less waive sovereign immunity against it; and (2) section 2001.038 instead impliedly preempts claims for injunctive relief grounded in any external legal or equitable theory.

To address appellants' contentions, we will begin by observing that their central premise regarding APA section 2001.038—that the statute forecloses injunctive relief accompanying the declaratory judgments regarding a rule's "validity or applicability" that it expressly authorizes—is belied by decisions both from this Court and, more importantly, from the Texas Supreme Court. This Court has repeatedly held that trial courts may award temporary injunctive relief against an agency in connection with pending rule challenges under section 2001.038, reasoning that the statute's waiver of immunity suffices to confer jurisdiction to grant the injunctive relief and that such relief is necessary to make effective the declaratory relief the Legislature has expressly authorized.[108] As for the Texas Supreme Court, in the 2008 *El Paso*

---

[107] *See* Tex. Gov't Code § 2001.038.

[108] *See Salazar*, 304 S.W.3d at 903-04 (citing *Texas Alcoholic Beverage Comm'n v. Amusement & Music Operators of Tex., Inc.*, 997 S.W.2d 651, 659 (Tex. App.—Austin 1999, pet. dism'd w.o.j.); *Rutherford Oil Corp. v. General Land Office*, 776 S.W.2d 232, 235-36 (Tex. App.—Austin 1989, no writ)); *Combs v. Entertainment Publ'ns, Inc.*, 292 S.W.3d 712, 720

*County Hospital District* case, which involved a section 2001.038 challenge to the procedural validity of a rule, the court rendered judgment against the agency "declaring the rule invalid *and enjoining its enforcement.*"[109] And in 2013, the supreme court revisited its 2008 *El Paso* opinion at some length to resolve several disputes concerning the temporal effect of that same permanent injunction.[110] Although neither decision elaborates as to the precise jurisdictional basis for the high court's award of injunctive relief, what is perhaps of greater significance is that the court never perceived any cause to question that jurisdiction in the first place. This is particularly notable considering that the Texas Supreme Court has increasingly emphasized—and especially so by the time of its second *El Paso* opinion—that sovereign immunity, like other jurisdictional issues, may be raised for the first time on appeal.[111]

Although appellants urge that the rationales of this Court's decisions would extend only to temporary injunctive relief, they have no persuasive response to the Texas Supreme Court's apparent acceptance that courts have jurisdiction to award permanent injunctive relief in connection with a declaratory judgment invalidating a rule under APA section 2001.038. Unless and until the high court instructs us otherwise, we hold that the district court possesses such jurisdiction here.

---

(Tex. App.—Austin 2009, no pet.); *Keeter v. Texas Dep't of Agric.*, 844 S.W.2d 901, 902 (Tex. App.—Austin 1992, writ denied); *Lopez v. Public Util. Comm'n*, 816 S.W.2d 776, 782 (Tex. App.—Austin 1991, writ denied); *see also Watson v. North Tex. Higher Educ. Auth., Inc.*, No. 03-00-00139-CV, 2000 Tex. App. LEXIS 7017, at *30-31 (Tex. App.—Austin Oct. 19, 2000, pet. dism'd by agr.) (mem. op.).

[109] *El Paso Cnty. Hosp. Dist. v. Texas Health & Hum. Servs. Comm'n*, 247 S.W.3d 709, 715 (Tex. 2008) (emphasis added).

[110] *See El Paso Cnty. Hosp. Dist. v. Texas Health & Hum. Servs. Comm'n*, 400 S.W.3d 72, 78-82 (Tex. 2013).

[111] *See Rusk State Hosp.*, 392 S.W.3d at 95-96; *see also Giggleman*, 408 S.W.3d at 707 n.18 (raising sovereign immunity sua sponte).

The question then becomes whether appellees' claims for injunctive relief are properly directed against DSHS, the Commissioner in his official capacity, or both. Appellees have "covered their bases" by asserting the claims against both. The supreme court's *El Paso* decision and this Court's prior decisions indicate that DSHS is a proper defendant, as it is the proper defendant to the underlying suit for declaratory judgment under APA section 2001.038.[112] But we find no harmful error, if any error, in the district court's assertion of jurisdiction over the claims for injunctive relief to the extent they are also addressed, as a formal matter, to the Commissioner in his official capacity.

This rather ethereal distinction, as the Texas Supreme Court has acknowledged, merely represents alternative "way[s] of pleading an action against the entity of which the official is an agent."[113] Its chief significance is in the context of establishing jurisdiction solely through an ultra-vires theory, a rubric under which the court has emphasized the conceptual distinction between suing "the State"or an agency versus suing a human agent of "the State" to reassert "the State's" control.[114] But the distinction has far less significance where, as here, sovereign immunity has been waived so as to permit a claim directly against a state agency (one agent of "the State") and the claimant formally pleads that claim, alternatively or additionally, against a human agent of "the State." In those circumstances, the distinction amounts merely to two different ways to plead for the same remedy against the same defendant.

---

[112] And if, as previously discussed, it turns out that appellees have asserted the claims against only the Commissioner and not DSHS, the omission—if ultimately material—would be readily curable. *See supra* note 34.

[113] *Heinrich*, 284 S.W.3d at 373 (quoting *Koseoglu*, 233.S.W.3d at 844 (quoting *Graham*, 473 U.S. at 165)).

[114] *See id*. at 372-73.

In the alternative, even if appellees' pleading of the injunctive claims against the Commissioner is analyzed under the ultra-vires rubric, we would conclude that sovereign immunity does not divest the district court of jurisdiction over the claims.[115] If, upon final trial, the district court rendered judgment under APA section 2001.038 declaring that one or more of the challenged rule provisions was in excess of appellants' statutory authority, it would follow that any further enforcement of such provisions would be ultra vires of that same statutory authority, and the district court would have subject-matter jurisdiction to restrain such conduct.[116]

Appellants insist that appellees have not satisfied the requisites of the ultra-vires theory as a basis for jurisdiction—"allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act," as opposed to merely performing an act within the officer's lawful discretion.[117] In that regard, appellants urge that we must proceed to the merits-overlapping analysis that a jurisdictional challenge to an ostensible ultra-vires claim may sometimes require: "[W]e construe the statutory or constitutional provisions that are implicated, apply them to the facts [pleaded] and that were not negated by evidence, and determine whether [the plaintiff] has alleged acts that would constitute violations."[118] However, we have recognized

---

[115] Appellants suggest this would be a redundant remedy to the extent the same injunctive relief would lie against DSHS under APA section 2001.038. Not so if, as we have suggested, the injunctive-relief claims against DSHS and the Commissioner, in his official capacity, are considered to be the same claim for relief against the same party. Alternatively, this ultra-vires theory would become relevant—and would not provide merely a redundant remedy—if, as appellants urge, injunctive relief cannot be obtained against DSHS by virtue of APA section 2001.038.

[116] One might similarly conclude that the continued enforcement of a rule declared procedurally invalid under the APA would exceed appellants' statutory authority under the APA, but we need not reach that question.

[117] *Heinrich*, 284 S.W.3d at 372.

[118] *Creedmoor-Maha*, 307 S.W.3d at 516.

that in circumstances where this jurisdictional analysis of an ultra-vires claim would also have the effect of deciding the merits of a claim under APA section 2001.038 that is within the trial court's jurisdiction by virtue of that statute's waiver of immunity, a trial court does not err in deferring that overlapping determination until a later time.[119]  Those are the circumstances here—deciding "jurisdiction" with regard to appellees' ultra-vires theory, as appellants would have us do, would decide disputes regarding appellants' statutory authority that also underlie appellees' section 2001.038 rule challenge and comprise the merits of that claim.  The district court would not have erred in declining to dismiss appellees' injunctive claims against the Commissioner on this ground.[120]

## CONCLUSION

We conclude that the district court lacks subject-matter jurisdiction over appellees' claims under the UDJA.  To that extent, we reverse its order denying appellants' plea to the jurisdiction and render judgment dismissing appellees' UDJA claims without prejudice to refiling.  However, as to all of appellees' other claims, we conclude that the district court possesses

---

[119] *See Sunset Transp., Inc.*, 357 S.W.3d at 705; *see also Salazar*, 304 S.W.3d at 903 (where plaintiff asserted section 2001.038 rule challenges and UDJA ultra-vires claims turning on same underlying statutory-authority issues, reasoning that "if the Appellees have raised valid challenges to the Department's rules under the APA, then we need not determine whether the Appellees have properly alleged ultra vires claims because the trial court's subject-matter jurisdiction is established by section 2001.038 of the APA").

[120] *See Sunset Transp., Inc.*, 357 S.W.3d at 705; *Salazar*, 304 S.W.3d at 903.  *Cf. Miranda*, 133 S.W.3d at 227 (in regard to evidence-based jurisdictional challenges, explaining that trial courts possess discretion "in deciding whether the jurisdictional determination should be made at a preliminary hearing or await a fuller development of the case, mindful that this determination must be made as soon as practicable"); *see also Bland Indep. Sch. Dist.*, 34 S.W.3d 554 (plea to the jurisdiction generally "should be decided without delving into the merits of the case").

subject-matter jurisdiction to adjudicate them. Accordingly, to that extent, we affirm its order denying appellants' plea.

Our holdings, of course, concern only whether the district court has *jurisdiction* to adjudicate appellees' claims, and we intend no comment on the merits of the claims themselves—let alone concerning any broader policy disputes from which those claims might arise.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Field

Affirmed in part; Reversed and Rendered in part

Filed: April 9, 2014