# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00671-CV

---

**Michael Motheral in his Official Capacity as Chair of the University Interscholastic League's State Executive Committee; Johanna Denson in her Official Capacity as Vice Chair of the UIL SEC; Paul Galvan in his Official Capacity as a member of the UIL SEC; and Daryl Wade in his Official Capacity as a member of the UIL SEC, Appellants**

**v.**

**Jennifer Black, individually, and A.B., a minor,
by and through his guardian, Jennifer Black, Appellees**

---

**FROM THE 53RD DISTRICT COURT OF TRAVIS COUNTY
NO. D-1-GN-21-006732, THE HONORABLE MARIA CANTÚ HEXSEL, JUDGE PRESIDING**

---

## MEMORANDUM OPINION

Jennifer Black, individually, and A.B., a minor, by and through his guardian Jennifer Black (collectively, "Plaintiffs") sued the following individuals in their official capacities as members of one of the University Interscholastic League's State Executive Committees: Michael Motheral as Chair, Johanna Denson as Vice Chair, Paul Galvan as a member, and Daryl Wade as a member (collectively, "UIL Defendants"), alleging that the UIL Defendants violated the Plaintiffs' constitutional rights to due course of law, equal protection, and free speech during a hearing regarding A.B.'s eligibility to play high school varsity sports, seeking declaratory relief regarding the validity of one of the UIL's rules, and seeking a temporary injunction allowing A.B. to participate in high school athletic competitions pending resolution of the underlying trial. The UIL Defendants filed a response to the request for a

temporary injunction asserting that the requirements for a temporary injunction had not been met and filed a plea to the jurisdiction asserting that the trial court did not have jurisdiction over the Plaintiffs' claims. After a hearing, the trial court issued an order denying the UIL Defendants' plea to the jurisdiction and granting the Plaintiffs' request for a temporary injunction. The UIL Defendants have appealed the trial court's order. We will affirm the portions of the trial court's order granting the temporary injunction and denying the plea to the jurisdiction regarding the Plaintiffs' due-course-of-law claim, reverse the remaining portions of the order denying the plea, and render judgment dismissing for want of jurisdiction the Plaintiffs' equal-protection claim, free-speech claim, and request for declaratory relief regarding the UIL rule.

## BACKGROUND[1]

Jennifer Black and Terry Black were married in 2004 and later had two sons: A.B. and B.B. Jennifer alleged that Terry abused her during their marriage, including threatening to kill her. Because of the alleged abuse, Jennifer separated from Terry, and they divorced in 2011. As part of the divorce decree, Jennifer was given the right to determine the residence for the couple's two children within Tarrant County or any contiguous county. Although the couple divorced, Terry continued to follow Jennifer and make efforts to exert control over her life.

After the divorce, Jennifer moved with her two children to Coppell, Texas, where her children attended school and participated in school sports programs. A.B. played on the high school basketball team during his freshman, sophomore, and junior years (2018-2021) under Coach Clint Schnell. In 2018, Jennifer began dating David Peavy, a high school coach in

---

[1] These facts are drawn from the evidence presented at the hearing before the trial court as well as evidence presented during the hearings before the University Interscholastic League committees occurring before and forming the basis for the temporary-injunction hearing.

Duncanville, Texas. As the relationship progressed, Peavy moved into Jennifer's Coppell home, where the couple lived together for more than two years. Jennifer and Peavy have co-parented Jennifer's children, and the couple got engaged in April 2021. After Jennifer and Peavy began dating, Terry harassed the couple and threatened violence against them, including threatening to blow up their house.

Before A.B. started his senior year in Coppell, Terry began pressuring him to transfer to a Florida academy to get ready to play basketball in college. However, A.B. did not want to transfer because he did not want to leave his family and friends, and A.B. intended to play basketball in Coppell for his senior year. Terry did not agree with A.B.'s choice and became angry about the situation. In August 2021, while A.B. and his brother were at a basketball tournament in Las Vegas, Nevada, Terry shouted at A.B. while he was on the court and later approached A.B. while he was on the bench, grabbed him by the hair, dragged him outside, and punched or pushed A.B.'s face.

Following this incident, Jennifer asked her younger son's coach to cancel B.B.'s scheduled game because she was afraid that Terry might cause another incident, and the coach agreed to cancel the team's scheduled game and offered to help Jennifer. Because Jennifer was frightened by Terry's aggressive behavior toward A.B., she contacted an attorney, seeking help obtaining a restraining order against Terry. Worried that the restraining order might take some time to go into effect, Jennifer also made the decision to move her family from their home in Coppell to another home unknown to Terry, and she asked her children to turn off their location apps on their phones to prevent Terry from discovering the location of their new home. After talking with Peavy, Jennifer decided to move to Duncanville, where Peavy worked and which is in a county contiguous with Tarrant County as the divorce decree required. Once the family

3

moved to Duncanville, Jennifer enrolled her children in the local high school, and A.B. joined the new school's basketball team. When Jennifer informed Coach Schnell about her decision to move away from Coppell, he told her that he supported her decision. Further, Schnell sent A.B. a text message stating that he wished A.B. "all the best" and knew he was "in good hands."

Following Jennifer's decision to move, Terry contacted Coach Schnell and Kit Pehl, who was the athletic director for the Coppell school district. In his discussions with Schnell and Pehl, Terry encouraged them to challenge Jennifer's decision to move her family and provided them with information that he argued showed that A.B. was being transferred for an improper athletic purpose and had been recruited. Pehl was surprised by Terry's decision to become involved in the matter because he thought that Terry would have supported A.B., knowing that Terry's suggested challenge could result in A.B. not being allowed to play basketball during his senior year, and because he had never heard of another parent ever seeking to challenge a school transfer on the ground that the other parent had moved with the child for an athletic purpose.

After talking with Terry, Pehl helped Schnell fill out a Previous Athletic Participation Form ("PAPF"). The University Interscholastic League ("UIL") requires that the PAPF be filled out in circumstances like those present here where a student transfers to a new school and had previously participated in sports. As filled out, the PAPF alleged that there was dissatisfaction or conflict among A.B., his parents, and the athletic supervisors at the school; that A.B. was recruited to attend Duncanville High School or had been subjected to undue influence encouraging him to change schools; and that A.B. was changing schools for athletic purposes. Approximately one month after Director Pehl submitted the PAPF to the UIL, a hearing before a UIL District Executive Committee ("DEC") was scheduled.

4

Before the DEC hearing, Pehl texted Terry to say that he and Schnell "want[ed] to collaborate with" Terry about how to frame their arguments at the hearing. Over the next two months, Pehl, Schnell, and Terry talked on the phone and met in person multiple times to discuss A.B.'s transfer. Moreover, Terry agreed to testify as a witness against the transfer even though Pehl could not remember any other DEC hearing in which a witness had been called to testify against a student.

At the DEC hearing in September 2021, the Plaintiffs were not represented by counsel. During the hearing, Schnell testified that he believed that A.B. had been recruited to play for Duncanville High School and that A.B. wanted to move to Duncanville to get more exposure to recruiters. Further, Schnell emphasized that Jennifer and Peavy were dating but were not married. Terry testified that A.B. expressed a desire to move to Duncanville months before the move and that Peavy had only lived with Jennifer for a few months. During Peavy's testimony, one of the DEC members asked whether he was married to Jennifer, and Peavy explained that they were engaged and had lived together for more than two years. Similarly, Jennifer testified that she had been in a long-term relationship with Peavy. Further, she related that she decided to move for A.B.'s best interests after there had been "some confrontation between [A.B.] and [Terry] this summer." In his testimony, A.B. stated that he was having an issue with his father right now. At the end of the hearing, the DEC voted unanimously that A.B. moved for athletic purposes, which rendered A.B. ineligible to play varsity sports at Duncanville High School for one year.

After the DEC hearing, Terry showed up at Jennifer's new home uninvited, unannounced, and without having been given her new address. Upon arriving at the house, Terry texted her photos of her new house, said that he was outside, and stated that he was there to pick

5

up his sons even though he had stopped picking up the children more than a year before when A.B. got his driver's license. While Terry was outside, B.B. called Jennifer because he was scared. Jennifer's attorney sent a letter to Terry requesting that he not attend B.B.'s basketball games because of B.B.'s anxiety and that Terry participate in counseling to address the recent conflicts, including the Las Vegas incident.

Jennifer and A.B. appealed the DEC's decision, and a hearing was scheduled before a UIL State Executive Committee ("SEC") in October 2021. Jennifer filed with the SEC a declaration setting out the abusive nature of her relationship with Terry and the events in Las Vegas. Before the SEC hearing, Coach Schnell obtained a copy of the exhibits that had been submitted for the hearing and suggested that Director Pehl send the documents to Terry and inform him about the abuse allegations to allow him to prepare a response. Pehl agreed and sent Terry the exhibits so that he could "see Jennifer's new agenda," later admitting that he wanted to help prepare Terry to testify about the allegations and identified topics that Terry should discuss. Around that time, Terry sent Pehl a photo of A.B. playing basketball at a non-UIL event and asked whether something should be done about A.B.'s participation.

At the SEC hearing, the Plaintiffs were represented by attorneys. When one of their attorneys attempted to provide an opening statement and attempted to discuss the abuse allegations, one of the UIL Defendants repeatedly interrupted before telling the attorney to stop talking and warning the attorney about continuing to speak on the topic. During Jennifer's testimony, she was asked by one panelist about whether she was dating Peavy, and she testified that they had been dating for more than three years and living together for two years. When Jennifer started to explain how after Terry assaulted A.B. in Las Vegas she moved her family to

6

Duncanville to protect the mental and physical health of her children,[2] one UIL Defendant stated that they were aware of the allegation but were "not gonna press . . . hard on that issue."

Following that exchange, the UIL Defendants questioned Jennifer and Peavy about the PAPF, about when they moved to Duncanville, about how they met, about tweets by Duncanville coaching staff congratulating A.B. about his basketball performance, and about whether A.B. knew any students at Duncanville High School. Peavy testified that Jennifer did not express dissatisfaction with Schnell's coaching but only with A.B.'s placement on the second all-district team as a sophomore and explained that A.B. continued to play in Coppell for his junior year. Later, Jennifer mentioned the Las Vegas incident and explained that she would not have moved had the incident not occurred, that Terry was the one who was unhappy with Schnell's coaching, and that she had turned down offers from sponsors and elite leagues seeking to enroll A.B. to play basketball. Following his mother's testimony, A.B. stated that Terry stopped reaching out to him and B.B. after the Las Vegas incident and that he has not talked with Terry since Las Vegas except at the DEC hearing. During the SEC hearing, one of the Plaintiffs' attorneys requested that the UIL Defendants ask Jennifer and A.B. about the abuse, but the UIL Defendants did not follow up with any questions other than to ask when the Las Vegas incident occurred.

At the SEC hearing, Coach Schnell acknowledged that Jennifer and Peavy were dating but believed that Jennifer, Terry, and A.B. had discussed the possibility of A.B. transferring to Duncanville in 2019. Schnell admitted that he sent a text to Jennifer in which he stated that he was disappointed that A.B. was leaving Coppell but wished A.B. "all the best."

---

[2] During Jennifer's testimony, Terry, Schnell, and Pehl texted among one another regarding her statements. In one of those communications, Pehl told Terry, "She moved 28 miles. If all this is true (ha-ha), how did that make her safe? You live in Fort Worth."

Schnell emphasized that Peavy and Jennifer are not married so the move cannot be justified on that basis. Terry testified that he was blindsided by the decision to move A.B. Terry acknowledged that he yelled at and "pushed [A.B.] in the head" in Las Vegas, and he stated that A.B. had been unhappy at Coppell High School and discussed going somewhere else.

During the closing argument by one of the Plaintiffs' attorneys, one UIL Defendant repeatedly interrupted and told the attorney to wrap up the argument. At the end of the hearing, the panel unanimously voted to deny the appeal.

Following the ruling by the SEC, the Plaintiffs sued the UIL Defendants in their official capacities as SEC members. In their petition, the Plaintiffs sought a temporary injunction enjoining the UIL Defendants from enforcing against A.B. UIL Rule 443, which renders students ineligible to participate in UIL athletics if they transfer for athletic purposes, and from enforcing the SEC decision declaring A.B. ineligible to participate in athletics in Duncanville. Further, the Plaintiffs sought a declaration that the UIL Defendants violated the due-course-of-law provision of the Texas Constitution by failing to provide a fair hearing in front of the SEC. *See* Tex. Const. art. I, § 19. In addition, the Plaintiffs sought a declaration regarding the constitutionality of UIL Rule 443. The Plaintiffs also sought a declaration that the UIL Defendants violated their right to free speech under the Texas Constitution by considering whether they previously criticized or expressed frustration with the Coppell coaches when deciding if A.B. transferred for an athletic purpose. *See id.* art. I, § 8. Finally, the Plaintiffs sought a declaration that the UIL Defendants violated the equal-protection provision of the Texas Constitution by treating them differently based on Jennifer's marital status. *See id.* art. I, § 3.

The UIL Defendants filed a response to the request for a temporary injunction and a plea to the jurisdiction. The UIL Defendants asserted that the Plaintiffs failed to plead viable

8

constitutional claims against them, that the alleged facts and attached evidence did not suggest any constitutional violations, and that, therefore, Jennifer's claims were barred by sovereign immunity. Accordingly, the UIL Defendants urged the trial court to grant their plea to the jurisdiction and dismiss the Plaintiffs' claims. Building on those assertions, the UIL Defendants also asserted that the Plaintiffs' request for a temporary injunction should be denied, arguing that the Plaintiffs could not establish probable, imminent, and irreparable injuries entitling them to injunctive relief. The Plaintiffs then filed a response in opposition to the plea to the jurisdiction, contending that the trial court had jurisdiction over their claims.

The trial court held a hearing to consider the Plaintiffs' request for a temporary injunction and the UIL Defendants' plea to the jurisdiction. At the hearing, several witnesses testified, including Jennifer, A.B., Peavy, and one of Jennifer's friends, and portions of a deposition by Director Pehl were read into the record. In addition, the trial court admitted into evidence multiple exhibits offered by the Plaintiffs, including transcripts of the DEC and SEC hearings, the transcript of Pehl's deposition, the PAPF, and copies of text messages from Jennifer, Terry, and Schnell.

Jennifer testified regarding her reasons for divorcing Terry, the abuse that Terry inflicted on her during their marriage, the threats that Terry made to her and her family after the divorce, the incident in Las Vegas, her decision to move to Duncanville following that incident for the safety of her children, and the incidents that occurred after the move. Further, Jennifer discussed how Coach Schnell focused on her marital status during the SEC hearing. Additionally, Jennifer mentioned that the UIL Defendants did not ask her any questions about Terry's abuse. Jennifer also characterized the SEC hearing as unfair because she and A.B. were only given a limited opportunity to speak, because her attorneys were prevented from making an

9

opening statement and from questioning witnesses, and because the SEC panel relied on her marital status when considering the appeal. Finally, Jennifer testified that the SEC decision and ensuing media coverage called into question her reputation in the community and implied that she lied about the abuse and the reason for the move, and the trial court admitted into evidence a newspaper article that had been written about the SEC hearing.

A.B. similarly testified about the incident in Las Vegas, about how he had intended to finish his senior year in Coppell, about how Jennifer decided to move the family to protect them from Terry, about how Peavy did not attempt to recruit him, about how the UIL Defendants did not question Terry about the abuse, about how they were not allowed to question Terry about the abuse, and about how he did not really have an opportunity to speak during the SEC hearing. Additionally, A.B. explained that he believed that the decision by the SEC would have been different if he had been given the opportunity to explain that the move was for safety reasons and that he believed Jennifer's marital status and their family status played a role in the SEC panel's eligibility determination. Further, A.B. testified that his reputation as a loyal and honest person has been undermined by the SEC determination and various resulting news articles. One of Jennifer's friends testified similarly regarding Jennifer's and A.B.'s reputations for loyalty and honesty and regarding how the SEC's decision and ensuing media coverage portrayed them as dishonest and disloyal.

Peavy testified regarding the incidents of abuse involving Terry and threats that Terry made to him and his family. Additionally, Peavy explained that the family intended for A.B. to go to Coppell High School his senior year before the incident in Las Vegas. Further, Peavy denied recruiting A.B. or pressuring Jennifer to move so that A.B. could play at Duncanville High School and related that A.B. had been happy playing basketball in Coppell.

10

After considering the testimony, evidence, and argument presented during the hearing, the trial court issued an order denying the UIL Defendants' plea to the jurisdiction and granting the Plaintiffs' request for a temporary injunction.

## DISCUSSION

In their first issue on appeal, the UIL Defendants contend that the trial court erred by denying their plea to the jurisdiction. Essentially, the UIL Defendants argued that the Plaintiffs' claims are barred by sovereign immunity because the claims are not viable and because the evidence did not create a fact issue about whether the claims were barred by immunity. In their second issue on appeal, the UIL Defendants assert that the trial court abused its discretion when it granted Plaintiffs' request for a temporary injunction.

**Plea to the Jurisdiction**

*Standard of Review*

A plea to the jurisdiction is a procedural mechanism "through which a party may challenge a trial court's authority to decide the subject matter" of a cause of action. *Texas Dep't of State Health Servs. v. Balquinta*, 429 S.W.3d 726, 737 (Tex. App.—Austin 2014, pet. dism'd). A plea to the jurisdiction "may challenge the pleadings, the existence of jurisdictional facts, or both." *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018). Appellate courts review de novo a trial court's ruling on a plea to the jurisdiction. *Texas Dep't of Ins. v. Texas Ass'n of Health Plans*, 598 S.W.3d 417, 420 (Tex. App.—Austin 2020, no pet.).

"If a plea 'challenges the pleadings, we determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause.'" *Texas Dep't of Crim. Just. v. Rangel*, 595 S.W.3d 198, 205 (Tex. 2020) (quoting *Texas Dep't of Parks & Wildlife v.*

11

*Miranda*, 133 S.W.3d 217, 226 (Tex. 2004)). "In determining whether the plaintiff has met that burden, 'we liberally construe the pleadings, taking all factual assertions as true and looking to [the plaintiff's] intent.'" *Id.* (quoting *City of Ingleside v. City of Corpus Christi*, 469 S.W.3d 589, 590 (Tex. 2015)). "[I]f a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, as the trial court is required to do." *Miranda*, 133 S.W.3d at 227 (citing *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000)). "[I]n a case in which the jurisdictional challenge implicates the merits of the plaintiffs' cause of action and the plea to the jurisdiction includes evidence, the trial court reviews the relevant evidence to determine if a fact issue exists." *Id.* "If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact finder." *Id.* at 227-28. "[I]f the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law." *Id.* at 228.

"Sovereign immunity implicates a trial court's subject matter jurisdiction and 'thus is properly asserted in a plea to the jurisdiction.'" *Rangel*, 595 S.W.3d at 205 (quoting *Miranda*, 133 S.W.3d at 226). Generally speaking, sovereign immunity deprives courts of subject-matter jurisdiction over suits against the State or its agencies. *See Balquinta*, 429 S.W.3d at 738. In other words, there is no right to judicial review of an order by a governmental entity "unless a statute provides a right or unless the order adversely affects a vested property right or otherwise violates a constitutional right." *Continental Cas. Ins. Co. v. Functional Restoration Assocs.*, 19 S.W.3d 393, 397 (Tex. 2000). "Sovereign immunity extends to state officials acting in their official capacity." *Machete's Chop Shop, Inc. v. Texas Film Comm'n*, 483 S.W.3d 272,

12

278 (Tex. App.—Austin 2016, no pet.). If a state official files a plea to the jurisdiction, the official may invoke the sovereign immunity held by the government itself because a suit against a state official is merely an alternative way of filing suit against the entity to which the official belongs. *Texas A & M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 844 (Tex. 2007).

"[I]n certain narrow instances, a suit against a state official can proceed even in the absence of a waiver of immunity if the official's actions are *ultra vires*." *Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017). Under the ultra vires exception to sovereign immunity, a plaintiff may file suit to compel a government official "to comply with statutory or constitutional provisions" through prospective declaratory or injunctive relief. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372, 376 (Tex. 2009); *see LMV-AL Ventures, LLC v. Texas Dep't of Aging & Disability Servs.*, 520 S.W.3d 113, 125 (Tex. App.—Austin 2017, pet. denied). To fall within this exception, the plaintiff must allege "that the officer acted without legal authority or failed to perform a purely ministerial act." *Heinrich*, 284 S.W.3d at 372.

An allegation that a government official violated an individual's constitutional rights is "an allegation that the officer acted ultra vires, that is, in conflict with the law constraining his discretion." *Caleb v. Carranza*, 518 S.W.3d 537, 542 (Tex. App.—Houston [1st Dist.] 2017, no pet.). If a plaintiff seeks to vindicate a constitutional right, "immunity from suit is not waived if the constitutional claims are facially invalid." *Klumb v. Houston Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 13 (Tex. 2015). "[I]f the claimant is attempting to restrain a state officer's conduct on the grounds that it is unconstitutional, it must allege facts that actually constitute a constitutional violation." *Creedmoor-Maha Water Supply Corp. v. Texas Comm'n on Env't Quality*, 307 S.W.3d 505, 516 (Tex. App.—Austin 2010, no pet.). "A court has no jurisdiction over an ultra vires claim that fails as a matter of law." *McLane v. Thomas*,

13

No. 03-18-00439-CV, 2020 WL 1073775, at *9 (Tex. App.—Austin Mar. 6, 2020, pet. denied) (mem. op.).

*Due Course of Law*

In their live petition, the Plaintiffs asserted that the UIL Defendants violated the due-course-of-law provisions of the Texas Constitution, which provide that "[n]o citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disenfranchised, except by the due course of the law of the land." Tex. Const. art. 1, § 13; *see also id.* art. 1, § 19 (explaining that and that "[a]ll courts shall be open, and every person for an injury done him, in his . . . reputation, shall have remedy by due course of law"). Essentially, the Plaintiffs contended that their liberty interests were implicated by the UIL Defendants' determination regarding A.B.'s eligibility, that they were denied a fair hearing before the SEC, and that procedural safeguards could have been employed that would not have a substantial impact on future UIL determinations. In response, the UIL Defendants argued that the UIL determination did not implicate the Plaintiffs' liberty interests, that the Plaintiffs received adequate due process, and that any procedural defect would not have entitled A.B. to be eligible to play.

Although the Texas Constitution refers to "due course of law" rather than "due process" as in the federal Constitution, courts have recognized that those terms do not have a meaningful distinction and, therefore, follow contemporary cases addressing federal due-process issues. *Mosley v. Texas Health & Hum. Servs. Comm'n*, 593 S.W.3d 250, 264 (Tex. 2019). In reviewing a due-process challenge, courts must determine if the claimants have a property or liberty interest that warrants procedural due-process protection and, if so, what process is due.

14

*Id.* Liberty interests include the right to "establish a home and bring up children," *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 572 (1972) (noting that term "'liberty' must be broad indeed"), as well as "a person's good name, reputation, honor, or integrity," *University of Tex. Med. Sch. at Hous. v. Than*, 901 S.W.2d 926, 930 (Tex. 1995).

As highlighted by the UIL Defendants, courts have determined that parents have rights regarding the type of education that their children receive but do not have liberty interests in "particular components of that education, such as participation in interscholastic athletics." *Cornerstone Christian Sch. v. University Interscholastic League*, 563 F.3d 127, 136 (5th Cir. 2009); *see Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395-96 (6th Cir. 2005). However, the Plaintiffs did not assert a liberty interest in an education component and instead pleaded that Jennifer has a liberty interest in determining the care, custody, and control of her children and the right to control their education. "[T]he interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by" courts. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Further, the Plaintiffs pleaded that the UIL Defendants' decision implicated their liberty interests in their good name, reputation, honor, and integrity. *See Roth*, 408 U.S. at 573 (observing that where person's name, reputation, honor, or integrity is impacted by what government is doing, opportunity to be heard is essential); *see also Goss v. Lopez*, 419 U.S. 565, 575 (1975) (noting that suspension deprived students of liberty interest to their reputation with their fellow students and their teachers).

During the hearing in the trial court, Jennifer testified regarding Terry's abusive behavior toward her and her family and regarding how she decided to move to keep her children safe after Terry abused A.B. in Las Vegas. Similarly, A.B. testified at the hearing that Jennifer decided to move because she felt as though her children's "safety was jeopardized with [Terry]

15

knowing where" the family lived and wanted to move her family away from Terry to keep them safe. Peavy also testified that Jennifer did not want to move prior to the Las Vegas incident.

At the hearing, Jennifer explained that the SEC determination as reflected in the ensuing media coverage indicated that the UIL Defendants did not believe her claims about her desire to move because of Terry's abusive conduct and that she lied about her reason for the move. Similarly, A.B. testified that the UIL Defendants' decision injured his reputation for loyalty and honesty and that news articles written about the case made his family seem like liars. Further, one of Jennifer's friends testified that Jennifer had been portrayed as dishonest and disloyal. At the hearing, the trial court admitted into evidence an article by a Texas newspaper describing her testimony about the abuse and explaining that the UIL Defendants were "not sway[ed]" by her "[c]laims of domestic violence" and concluded that A.B. moved for athletic purposes.

On appeal, the UIL Defendants contend that the Plaintiffs' reputational claims fail as a matter of law and did not plead a deprivation of a protected liberty interest in their reputations because the UIL Defendants did not publicly make a false charge that would give rise to a "badge of infamy" or subject the Plaintiffs to "public scorn." *See Blackburn v. City of Marshall*, 42 F.3d 925, 936 (5th Cir. 1995) (quoting *Wells v. Hico Indep. Sch. Dist.*, 736 F.2d 243, 256 & n.16 (5th Cir. 1984)). Instead, the UIL Defendants contend that they simply declared that the Plaintiffs had failed to meet their burden of establishing that the transfer was not for athletic purposes. Further, the UIL Defendants contend that the contents of the newspaper story were the

16

reporter's interpretation of the SEC determination and did not reflect any commentary by the UIL Defendants.[3]

However, the Plaintiffs are not alleging that the UIL Defendants made a public statement or comment to a newspaper about them; rather, the Plaintiffs are alleging that the UIL Defendants failed to provide adequate due process during the SEC hearing, resulting in a determination contradicting the Plaintiffs' alleged basis for transferring schools and injuring their liberty interests. The Texas Supreme Court has determined that similar agency determinations made without sufficient due process implicate protected liberty interests. *See Than*, 901 S.W.2d at 930 (concluding that medical student charged with academic dishonesty had "a constitutionally protected liberty interest in his graduate education that must be afforded procedural due process"). Moreover, the Plaintiffs do not base their due-process claim on the alleged reputational injury alone but also on how the stigma stemming from the UIL's decision implicated Jennifer's "ability to make decisions about child rearing"—including ensuring the safety of her children—"education, and family relationships without government intrusion." *See University Interscholastic League v. Hatten*, No. 03-03-00691-CV, 2004 WL 792328, at *2 (Tex. App.—Austin Apr. 15, 2004, no pet.) (mem. op.) (discussing in temporary-injunction context

---

[3] In their brief, the UIL Defendants urge that one of our sister courts of appeals rejected a claim that the type of injury alleged in this case warranted protection. *See Hatten v. University Interscholastic League*, No. 13-06-00313-CV, 2007 WL 2811833 (Tex. App.—Corpus Christi-Edinburg Sept. 27, 2007, pet. denied) (mem. op.). In that case, our sister court did not determine that reputational injuries stemming from UIL rulings regarding eligibility determinations could not support a due-process claim; instead, the court determined (1) that the appeal was moot because one of the students had graduated and because the other student's period of ineligibility had expired and (2) that the collateral-consequences exception to the mootness doctrine did not apply because the consequences from the UIL's ruling on the students' eligibility determination were minor when compared with the stigmatizing effects in other contexts that have supported a conclusion that the exception should apply. *Id.* at *4.

17

how claim regarding "stigmatizing effect of the UIL's actions" when ruling student ineligible implicated parents' liberty interests).

Based on the preceding, we conclude that the Plaintiffs pleaded a liberty interest that warrants due-process protection. *Cf. Dixon v. Alabama State Bd. of Educ.*, 294 F.2d 150, 157 (5th Cir. 1961) (concluding that students expelled from state university for misconduct have interest in continuing education at college at which they were in good standing that is entitled to due process), *abrogation on other grounds recognized by Walsh v. Hodge*, 975 F.3d 475 (5th Cir. 2020). Having made that determination, we must now address the Plaintiffs' claims regarding the process that was due.

At a minimum, due process requires notice and an opportunity to be heard in a meaningful manner and at a meaningful time. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). The process due is a flexible standard that depends on the requirements of the circumstances. *Id.* at 334. The following three factors are considered in this flexible standard:

> (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Than*, 901 S.W.2d at 930.

Regarding the private interest that will be affected, as discussed earlier, the Plaintiffs alleged that the UIL Defendants' determination impacted the Plaintiffs' fundamental liberty interest regarding their reputations and regarding the care of their family, *see Troxel*, 530 U.S. at 65, including Jennifer's right to provide for the safety of her children without government interference, *see Hatten*, 2004 WL 792328, at *2.

18

Regarding the risk of an erroneous deprivation of that right, the Plaintiffs pleaded, among other things, that the UIL Defendants failed to comply with the procedural requirements found in the UIL's rules for SEC hearings and that this noncompliance deprived the Plaintiffs of the opportunity to be heard in a meaningful manner. *See Than*, 874 S.W.2d 839, 851 (Tex. App.—Houston [1st Dist.] 1994) (noting that failure to comply with agency rules is not per se violation of due process but observing that failure to follow rules can result in due-process violation). For example, the Plaintiffs noted that UIL Rule 100 allows parties to be represented by counsel during an SEC hearing and allows attorneys representing parties to, among other things, request that the SEC panel "pose certain questions or lines of inquiry to another party or witnesses" and "make opening and closing statements on behalf of their client(s)." Further, the Plaintiffs asserted that the UIL Defendants failed to comply with the requirements of that Rule by refusing to ask the Plaintiffs about the assault by Terry despite the request from their attorney, by prohibiting the Plaintiffs' attorney from making an opening statement, and by curtailing the Plaintiffs' attorney's closing arguments. Additionally, the Plaintiffs contended that the process provided by the UIL Defendants in this case prohibited the Plaintiffs from an opportunity to be meaningfully heard on the issue of whether they moved for reasons other than an athletic purpose.

As support for these assertions, the Plaintiffs referred to portions of the transcript from the SEC hearing. At the beginning of the hearing, the Plaintiffs' attorney attempted to provide an opening statement regarding the history of domestic abuse in the family, but one of the UIL Defendants repeatedly interrupted the attorney and directed the attorney to stop speaking on the matter and explained that he was "warning" the attorney about continuing to speak. Moreover, during the closing argument by one of the Plaintiffs' attorneys, one UIL Defendant

19

repeatedly told the attorney to wrap up the argument. Further, one of the Plaintiffs' attorneys asked the UIL Defendants to question Jennifer and A.B. about the allegations of abuse, including the incident in Las Vegas, and about how the abuse formed the basis for the transfer, but the UIL Defendants posed no questions to either of the Plaintiffs or to Terry about the details of the abuse other than to ask when the Las Vegas incident occurred. *Cf. Flaim v. Medical Coll. of Ohio*, 418 F.3d 629, 636 (6th Cir. 2005) (noting in expulsion context that accused student generally has right to respond and defend, including ability to make statement and present evidence). Additionally, when Jennifer tried to explain the nature of the abuse and how it prompted her decision to move, one UIL Defendant suggested that the panel was not going to give much weight to the subject matter.

Turning to the government's interest, we note that the mission of the UIL is best served by ensuring that an accurate determination is made regarding whether a student transferred for athletic purposes. *Cf. In re L.N.C.*, 573 S.W.3d 309, 322 (Tex. App.—Houston [14th Dist.] 2019, pet. denied). Moreover, as set out above, the Plaintiffs alleged, among other things, that their due-process rights were violated because the UIL Defendants did not comply with the process required by the UIL Rules and, accordingly, did not provide the Plaintiffs with a meaningful opportunity to be heard. Requiring the UIL Defendants to comply with those requirements would not impose additional fiscal or administrative burdens. Further, the Plaintiffs alleged that any additional safeguards that might be deemed necessary would not impose significant burdens. Consistent with that proposition, the Plaintiffs referred to a Sunset Advisory Commission report explaining that additional procedural safeguards for UIL determinations would not have a fiscal impact and could be accomplished with existing UIL resources. *See* Sunset Advisory Commission, *Staff Report with Final Results: University*

20

*Interscholastic League* (July 2015), at 22, *available at* https://www.sunset.texas.gov/public/
uploads/files/reports/Final%20Results%20UIL%20book.pdf (last visited April 29, 2022).

In light of the preceding, we conclude that the Plaintiffs pleaded a facially valid claim that the process provided by the SEC hearing was insufficient and that the evidence presented before the trial court established that there is a fact question regarding whether the process that was provided was sufficient.

On appeal, the UIL Defendants contend that the Plaintiffs' complaints about the SEC hearing must fail because that was the second hearing, because due process need only be provided once, and because the Plaintiffs did not raise any procedural issue with the DEC hearing, referring to the appeal before the SEC as a gratuitous hearing that requires no process. As support for this proposition, the UIL Defendants refer to an opinion by our sister court of appeals that we believe is distinguishable because it explains that due-process complaints regarding an initial hearing can be cured if due process is provided at a subsequent hearing. *See United Indep. Sch. Dist. v. Gonzalez*, 911 S.W.2d 118, 126-27 (Tex. App.—San Antonio 1995, writ denied).[4] The *Gonzalez* court did not determine that due-process violations in the final review of an initial decision may not serve as a basis for a due-process claim and did not suggest that a trial court would have no jurisdiction to consider those types of violations. In any event, that case is not binding on this Court, *see HWY 3 MHP, LLC v. Electric Reliability Council of Tex.*, 462 S.W.3d 204, 211 n.4 (Tex. App.—Austin 2015, no pet.) (explaining that analysis from

_____

[4] The UIL Defendants also refer to several federal circuit decisions addressing due-process rights in the high-school-suspension and college-expulsion contexts. *See, e.g.*, *Brewer v. Austin Indep. Sch. Dist.*, 779 F.2d 260, 263 (5th Cir. 1985); *Smith v. Severn*, 129 F.3d 419, 429 (7th Cir. 1997); *Winnick v. Manning*, 460 F.2d 545, 549 n.5 (2d Cir. 1972). However, those cases are not binding on this Court. *See Charleston v. Allen*, 420 S.W.3d 134, 137 n.6 (Tex. App.—Texarkana 2012, no pet.) (recognizing that "opinions of the federal circuits are not binding on state courts").

sister court of appeals is not binding precedent), and any persuasive authority stemming from this case is undermined by the fact that this Court has previously determined that similar allegations could support a due-process claim, *see Hatten*, 2004 WL 792328, at *3.

When arguing that the Plaintiffs' claim fails, the UIL Defendants contend that the claim and requested declaratory relief are improper as a matter of law because the remedy for the denial of due process is due process. As support for that proposition, the UIL Defendants refer to *Than*, in which a medical student was dismissed from school for academic dishonesty following disciplinary proceedings. 901 S.W.2d at 928. The student then filed suit alleging that the medical school "violated his right to procedural due process under the due course of law guarantee of the Texas Constitution." *Id.* The trial court issued a temporary injunction pending trial and ultimately granted a permanent injunction following trial ordering the medical school to perform certain acts related to the student's status. *Id.* at 928, 929. On appeal, the Texas Supreme Court concluded that the medical school did not afford the student due process when making the disciplinary decision to expel him. *Id.* at 933. The Supreme Court then concluded that the permanent injunction exceeded the proper remedy of a fair hearing regarding the disciplinary charges. *Id.* at 934. Although the Supreme Court modified portions of the permanent injunction "pending a new hearing on the charge of academic dishonesty," it vacated the remainder of the permanent injunction. *Id.*

We believe that the procedural posture of *Than* distinguishes that case from the one here. *Than* involved an appeal regarding the propriety of a permanent injunction. Here, no permanent injunction has been issued, and no trial has yet been held. Moreover, we do not read *Than* as standing for the proposition that the failure to specifically request at this preliminary juncture for the trial court to order that a new SEC hearing or another hearing be held somehow

22

deprives the trial court of jurisdiction over the Plaintiffs' ultra vires claim that the UIL Defendants violated their due-course-of-law rights. *Cf. Trauth v. K.E.*, 613 S.W.3d 222, 225-26, 232 (Tex. App.—Austin 2020, pet. granted) (noting that plaintiff sought declarations that university officials' conduct was ultra vires and violated her due-process rights by revoking her previously awarded degree and concluding that requested injunctive relief ordering officials to reinstate her degree was proper prospective injunctive relief limited to restraining ultra vires act and did not implicate sovereign immunity).

For these reasons, we conclude that the Plaintiffs have properly pleaded an ultra vires claim against the UIL Defendants by alleging that they violated the Plaintiffs' due-course-of-law rights when making A.B.'s eligibility determination and that the evidence presented during the hearing before the trial court establishes a fact question regarding the jurisdictional issue of whether the UIL Defendants acted ultra vires. Accordingly, we conclude that the trial court properly determined that it had jurisdiction over this claim and denied the UIL Defendants' plea with respect to this claim.

*Free Speech*

In filing suit against the UIL Defendants, the Plaintiffs alleged that the UIL Defendants violated the free-speech provision of the Texas Constitution, which guarantees that "[e]very person shall be at liberty to speak, write or publish his opinions on any subject" and that "no law shall ever be passed curtailing the liberty of speech." *See* Tex. Const. art. 1, § 8. As support for this proposition, the Plaintiffs presented evidence showing that the PAPF reflected that there was conflict among A.B., his parents, and the athletic supervisors for Coppell High School and that Rule 443 lists unhappiness with former coaches as a common indicator of

23

a transfer being for an athletic purpose. Further, the Plaintiffs referenced Coach Schnell's testimony at the DEC that prior comments made by the Plaintiffs expressing dissatisfaction with his coaching showed that they intended to move for an impermissible athletic purpose, pointing to a text message that he received from Jennifer during A.B.'s sophomore year in which she stated that she was "disappoint[ed]" by A.B.'s being placed on the second all-district team. Additionally, the Plaintiffs referenced Schell's testimony before the DEC in which he testified that he indicated on the PAPF that there was dissatisfaction because there was a "constant cloud of dissatisfaction about [A.B.'s] role," about how he was being coached, about his lack of exposure, and about his lack of offers while playing in Coppell. In light of the preceding, the Plaintiffs contend that to the extent that the UIL Defendants' decision regarding A.B.'s eligibility was based on prior expressions of dissatisfaction, the UIL Defendants' actions burdened Plaintiffs' "free-speech rights with respect to expressing those feelings."

When alleging that their right to free speech was impermissibly burdened, the Plaintiffs did not assert that communications evidencing dissatisfaction with coaching staff or decisions by coaching staff can have no bearing on whether a transfer was made for athletic purposes; instead, the Plaintiffs essentially argue that the UIL Defendants' consideration of those types of statements as part of its decision making, even if relevant to the ultimate question, contravened the Plaintiffs' right to make them. In their appellees' brief, the Plaintiffs concede that certain types of statements, such as ones directly asserting that a parent will remove his or her child from school if the child does not have more playing time, could properly be considered when making eligibility determinations; however, they assert that the communications at issue have no relationship to the move and happened well before the move. Moreover, the Plaintiffs contend that the use of these types of communications could have a chilling effect on the ability

24

of parents and students to criticize coaches as evidenced by their testimony that they were hesitant to make any further criticism regarding coaching decisions for fear that A.B. would be retaliated against. In response, the UIL Defendants assert that even if the Plaintiffs' comments were considered as part of the decision process, the use of speech as evidence of motive and intent does not improperly burden the right to free speech.

The Supreme Court of the United States has explained in the criminal context that the right to free speech "does not prohibit the evidentiary use of speech . . . to prove motive or intent," *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993), and federal courts have applied this legal principle in the civil context, *see Whitaker v. Thompson*, 353 F.3d 947, 953 (D.C. Cir. 2004) (rejecting argument that claims about product were protected speech and explaining that "the use of speech to infer intent . . . is constitutionally valid"); *see also Smolla & Nimmer on Freedom of Speech* § 13.5 (noting that speech may be used to establish existence of illegal motive regarding treatment of employee).

Even though the Texas Supreme Court has commented that the free-speech provision of the Texas Constitution can be broader than the First Amendment in certain contexts, *see Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 116 (Tex. 2000), it has also explained that nothing in the language or purpose of the Texas provision authorizes courts "to afford greater weight in the balancing of interests to free expression than [they] would under the First Amendment," *Bentley v. Bunton*, 94 S.W.3d 561, 578 (Tex. 2002) (quoting *Ex parte Tucci*, 859 S.W.2d 1, 32 (Tex. 1993) (orig. proceeding) (Phillips, C.J., concurring)). Further, Texas courts have explained that cases addressing the First Amendment are persuasive authority for addressing claims under the Texas provision. *See Davenport v. Garcia*, 834 S.W.2d 4, 20 (Tex. 1992). The Plaintiffs did not attempt to show that the state constitutional provision affords any

25

greater protection than the First Amendment does, *see Bentley*, 94 S.W.3d at 578, and Texas cases have explained that the constitutional protection of free speech "is not a per se barrier to the admission of evidence protected by it" and that this type of evidence is "admissible if it is shown to be relevant to the issues involved in the case," *Martin v. State*, 570 S.W.3d 426, 439 (Tex. App.—Eastland 2019, pet. ref'd).

The statements at issue logically bear upon whether A.B.'s transfer was for athletic purposes by helping to potentially establish, among other things, that he intended to switch schools to achieve a better role or receive better treatment on a new team, and the UIL Defendants' alleged consideration of that evidence for the limited purpose of determining A.B.'s eligibility did not contravene the Plaintiffs' free-speech rights. Accordingly, the Plaintiffs' allegations that the UIL Defendants contravened their free-speech rights by considering their prior communications do not plead a facially valid constitutional claim.[5]

For these reasons, we conclude that the trial court erred by denying the UIL Defendants' plea to the jurisdiction as to the Plaintiffs' free-speech claim. Moreover, because the Plaintiffs had the opportunity to respond to the UIL Defendants' plea to the jurisdiction before the trial court ruled but still did not allege a facially valid constitutional claim and because the Plaintiffs have made no suggestion as to how the jurisdictional defect could be cured or asked for an opportunity to replead, they are not entitled to an opportunity to replead this claim. *See Koseoglu*, 233 S.W.3d at 840 (determining that remanding for opportunity to replead would

---

[5] On appeal, the Plaintiffs refer to a recent case by the Supreme Court of the United States as support for their argument that the trial court had jurisdiction over their free-speech claim. *See Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2042-43 (2021). However, in that case, the Court determined that the suspension of a student from her cheerleading team after she criticized the school and cheerleading team in Snapchat speech that "took place outside of school hours and away from the school's campus" violated her First Amendment rights. *Id.* The case before us presents entirely different facts and issues.

26

serve no legitimate purpose because alleging additional facts will not overcome immunity from suit); *Miranda*, 133 S.W.3d at 227, 231 (noting that suit should be dismissed when pleadings demonstrate that suit incurably falls outside any waiver of immunity and observing that parties had opportunity to amend their pleadings and did so and were not entitled to another opportunity to replead); *see also Ogueri v. Texas S. Univ.*, No. 01-10-00228-CV, 2011 WL 1233568, at *6 n.6 (Tex. App.—Houston [1st Dist.] Mar. 31, 2011, no pet.) (mem. op.) (observing that plaintiff did not ask for opportunity to replead on appeal and, therefore, not addressing whether plaintiff should be given opportunity to replead); *Haddix v. American Zurich Ins. Co.*, 253 S.W.3d 339, 347 (Tex. App.—Eastland 2008, no pet.) (concluding that trial court did not err by failing to give plaintiff opportunity to replead where he never explained "what he could plead that would address any of the jurisdictional challenges").

*Equal Protection*

At the trial court, the Plaintiffs also urged a claim under the equal-protection provision of the Texas Constitution, which provides that all people "have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges." Tex. Const. art. 1, § 3. "To state a viable equal-protection claim under the Texas Constitution, the Petitioners must show they have been 'treated differently from others similarly situated.'" *Klumb*, 458 S.W.3d at 13 (quoting *Texas Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 647 (Tex. 2004)).

The Plaintiffs alleged that the UIL Defendants relied on their statuses as a divorced and not-yet remarried mother and a child of divorced parents and treated them differently because of those statuses when determining A.B.'s eligibility. As support for this

27

allegation, the Plaintiffs pointed to portions of the record from the DEC hearing in which Coach Schnell noted multiple times that Jennifer and Peavy had a dating relationship but were not married and in which one of the DEC panelists asked Peavy if he was married to Jennifer after Peavy described A.B. as his stepson. Next, the Plaintiffs referred to portions of the record from the SEC hearing in which Schnell repeated similar statements about how Jennifer and Peavy were not married. Further, the Plaintiffs noted that during the SEC hearing one of the UIL Defendants asked Jennifer how long she had dated and lived with Peavy and later responded, "Okay," after Schnell finished a portion of his testimony stating that Jennifer and Peavy were not married and responded, "Mighty good," shortly thereafter when Director Pehl stated that he did not have anything to add to Schnell's testimony.

As an initial matter, we note that most of the evidence highlighted by the Plaintiffs involved conduct by individuals other than the UIL Defendants. *See Gonzalez*, 911 S.W.2d at 124 (noting that plaintiff's claims addressed actions by school employees and did not address conduct of reviewing board or implicate board's decision-making process); *see also Republican Party of Tex. v. Dietz*, 940 S.W.2d 86, 91, 93 (Tex. 1997) (noting that state action is required for claim regarding deprivation of right secured by equal-rights guarantee).

Although one of the UIL Defendants did ask Jennifer how long she had dated Peavy when obtaining background information, nothing in that exchange indicated that Jennifer's answer served as a basis for the SEC's decision or that the decision would have been different if she had been married to Peavy. Additionally, even though one of the UIL Defendants responded, "Okay," after Schnell finished a portion of his testimony discussing how Peavy and Jennifer were not married, Schnell testified on other topics related to the transfer as well, and the panelist regularly responded, "Okay," after witnesses answered a question, including one time in

28

which he thanked Jennifer for her testimony. Similarly, although that UIL Defendant responded, "Mighty good," when Pehl indicated that he did not have anything to add, he made the same response when another witness explained that he also had nothing to add. Moreover, nothing in the record from the SEC hearing indicates that the UIL Defendants improperly based their decision on the Plaintiffs' family status or treated them differently from others similarly situated. *Cf. Texas Utils. Elec. Co. v. Public Util. Comm'n*, 881 S.W.2d 387, 391 (Tex. App.—Austin 1994) (recognizing "a presumption of honesty and integrity in those serving as adjudicators"), *rev'd in part on other grounds*, 935 S.W.2d 109 (Tex. 1996).[6] Additionally, the letter the UIL Defendants sent to Jennifer informing her of their decision did not indicate that the Plaintiffs' family status was something they considered when making their determination or that the Plaintiffs were treated differently from others similarly situated.

In light of the preceding, we conclude that the evidence fails to create a fact question regarding whether the UIL Defendants acted ultra vires by violating the Plaintiffs' equal-protection rights and, accordingly, that the trial court erred by denying the UIL Defendants' plea to the jurisdiction with respect to the Plaintiffs' equal-protection claim. *Cf. Texas Dep't of Aging & Disability Servs. v. Loya*, 491 S.W.3d 920, 928 (Tex. App.—El Paso 2016, no pet.) (determining that plaintiff failed to present evidence raising fact issue and reversing trial court's order denying plea to jurisdiction). Moreover, because the Plaintiffs had

---

[6] The Plaintiffs contend on appeal that the UIL Defendants should not be entitled to a presumption of regularity like the agency members in *Texas Utilities Electric Co. v. Public Utility Commission* because the agency members in that case were subject to the Administrative Procedure Act and because the UIL Defendants are not. *See* 881 S.W.2d 387, 390 (Tex. App.—Austin 1994), *rev'd in part on other grounds*, 935 S.W.2d 109 (Tex. 1996); *see University Interscholastic League v. Southwest Offs. Ass'n, Inc.*, 319 S.W.3d 952, 965 (Tex. App.—Austin 2010, no pet.). However, nothing in *Texas Utilities* would appear to compel a determination that the presumption does not apply to adjudicators outside the context of the Administrative Procedure Act.

the opportunity to respond to the UIL Defendants' plea to the jurisdiction before the trial court ruled but did not allege additional facts or attach evidence creating a fact issue and because the Plaintiffs have made no suggestion regarding how the jurisdictional defect could be cured or asked for an opportunity to replead, they are not entitled to an opportunity to replead this claim. *See Koseoglu*, 233 S.W.3d at 840; *Miranda*, 133 S.W.3d at 231; *Ogueri*, 2011 WL 1233568, at *6 n.6; *Haddix*, 253 S.W.3d at 347; *see also City of Paris v. Abbott*, 360 S.W.3d 567, 583 n.13 (Tex. App.—Texarkana 2011, pet. denied) (providing that when there are "no facts demonstrating an equal protection cause of action have been . . . asserted," plaintiff is not entitled to opportunity to replead claim).

*Challenges to Rule 443*

In their live petition, the Plaintiffs sought as part of their due-course-of-law and free-speech claims declarations that Rule 443 is unconstitutionally vague, arbitrary, and capricious; is not rationally related to its purported purpose; and impermissibly burdens the exercise of free speech. Essentially, the Plaintiffs argue that Rule 443 provides insufficient guidance regarding what is a prohibited athletic purpose and improperly allows UIL committees to consider whether students or parents have expressed dissatisfaction with prior coaches as part of the determination regarding whether a transfer was for athletic purposes.[7] Originally, the Plaintiffs filed suit against the UIL Defendants and the UIL, but their live pleading, including their second amended petition and their supplement to their second amended petition, and their response to the UIL Defendants' plea to the jurisdiction omitted the UIL as a defendant. *See*

---

[7] In the portion of its live pleading addressing Rule 443, the Plaintiffs repeat their assertions that the UIL Defendants relied on Jennifer's marital status when making their determination about A.B.'s eligibility.

30

*Watanabe v. Summit Path Partners, LLC*, __ S.W.3d __, 2021 WL 3501542, at \*14 (Tex. App.—Houston [1st Dist.] Aug. 10, 2021, no pet.) (explaining that parties are dismissed from suit by omission of their names from amended pleading); *see also* Tex. R. Civ. P. 65 (stating that if substituted instrument is filed, "the instrument for which it is submitted shall no longer be regarded as a part of the pleading in the record of the cause"). On appeal, the UIL Defendants contend that the Plaintiffs were not entitled to declarations regarding the constitutionality of Rule 443.

Unlike the Plaintiffs' other claims challenging the UIL Defendants' actions as being ultra vires, the claim here challenges the propriety of Rule 443, which was passed through procedures initiated by the UIL and not by the UIL Defendants, and the Plaintiffs have made no argument that the procedures used to promulgate Rule 443 were not followed. *See* Tex. Educ. Code § 33.084 (setting out members of UIL advisory council and specifying that advisory council reviews UIL rules); *see also id.* §§ 33.0831 (providing limits on rules that would result in additional costs to member school), .081 (providing that students enrolled in school districts are subject to UIL rules governing extracurricular activities). Accordingly, to survive a jurisdictional challenge, the Plaintiffs' rule challenge must fall within a waiver of sovereign immunity authorized by the Texas Legislature. *Cf. Tooke v. City of Mexia*, 197 S.W.3d 325, 342-43 (Tex. 2006) (holding that immunity is not waived absent clear legislative intent to do so).

The Texas Legislature has waived sovereign immunity regarding challenges to a state agency's rules under the Administrative Procedure Act and set out the process by which those rules may be challenged, including the requirement that the agency be named as a party in the case. *See* Tex. Gov't Code § 2001.038. The definition for "state agency" under the Act includes many governmental entities but specifically excludes "an institution of higher learning."

31

*Id.* § 2001.003(7). By statute, the UIL "is a part of the University of Texas at Austin," Tex. Educ. Code § 33.083(b), which is an institution of higher learning, *see id.* § 61.003 (including University of Texas at Austin within meaning of institution of higher education).

This Court has previously determined that "the UIL is a governmental unit subject to sovereign immunity" but also explained that the UIL's status as part of an institution of higher learning means that the UIL is not subject to the limited waiver of sovereign immunity for challenging agency rules found in the Administrative Procedure Act. *University Interscholastic League v. Southwest Offs. Ass'n, Inc.*, 319 S.W.3d 952, 962, 965 (Tex. App.—Austin 2010, no pet.); *see also Saenz v. University Interscholastic League*, 487 F.2d 1026, 1027-28 (5th Cir. 1973) (noting that UIL was governmental entity, in part, because employees are paid by University of Texas at Austin). The legislature has addressed suits against the UIL in section 67.26 of the Education Code. *See* Tex. Educ. Code § 67.26. That provision is entitled "University Interscholastic League; Venue for Suits" and lists the proper venue for suits against the UIL and for suits involving the UIL's rules, but for suits involving UIL rules that provision only mentions suits "involving the interpretation or enforcement of the rules" and does not specifically address suits challenging the propriety or legality of those rules. *See id.*; *see also Tooke*, 197 S.W.3d at 342-43 (explaining that waiver of immunity must be clear). Even if section 67.26 can be read as waiving immunity for the types of rule challenges presented here, we believe that the UIL is a necessary party for that type of challenge.

This construction is consistent with case law addressing challenges to UIL rules. Although neither's case addressed the issue of sovereign immunity, the Texas Supreme Court and one of our sister courts of appeals have addressed challenges to the UIL's rules when the UIL was a party to the suit. *Sullivan v. University Interscholastic League*, 616 S.W.2d 170, 171,

32

173 (Tex. 1981); *University Interscholastic League v. North Dallas Chamber of Com. Soccer Ass'n*, 693 S.W.2d 513, 514, 518 (Tex. App.—Dallas 1985, no writ); *see also Cornerstone Christian Schs.*, 563 F.3d at 135-40 (addressing constitutional challenges to UIL rule when UIL was party); *Texas Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 622-23 (Tex. 2011) (noting distinction between governmental entity and officials as parties in sovereign-immunity context). That requirement is consistent with legislative waivers of immunity authorizing limited challenges to other types of laws. *See, e.g.*, Tex. Civ. Prac. & Rem. Code § 37.006(b) (requiring that municipality be made party to any proceeding challenging validity of municipal ordinance or franchise); Tex. Gov't Code § 2001.038 (requiring that agency be named as party in case challenging agency rule).

The requirement is also consistent with this Court's prior precedent addressing when governmental entities are indispensable parties to a lawsuit. Under the Rules of Civil Procedure, a party is indispensable if "in his absence complete relief cannot be accorded among those already parties," and trial courts should determine if the case should be dismissed if the absent person is "indispensable." Tex. R. Civ. P. 39(a), (b). The term "[p]erson includes . . . government or government subdivision or agency." Tex. Gov't Code § 311.005(2); *see also BASF Fina Petrochemicals Ltd. P'ship v. H.B. Zachry Co.*, 168 S.W.3d 867, 871 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (explaining that Code Construction Act applies to Rules of Civil Procedure). Although it is rare, "there are parties whose presence is so indispensable to the resolution of a cause of action that their absence can deprive a court of jurisdiction to determine such." *Travis Heights Improvement Ass'n v. Small*, 662 S.W.2d 406, 413 (Tex. App.—Austin 1983, no writ); *see Preston State Bank v. Willis*, 443 S.W.3d 428, 434 (Tex. App.—Dallas 2014, pet. denied); *Gilmer Indep. Sch. Dist. v. Dorfman*, 156 S.W.3d 586, 588 (Tex. App.—Tyler

33

2003, no pet.). This Court has previously determined that a city is "an indispensable party" to suits seeking to challenge the validity of the city's ordinances and, therefore, that a trial court lacked "jurisdiction to adjudicate the action" when the city was not a party. *Small*, 662 S.W.2d at 413; *see also Dorfman*, 156 S.W.3d at 588 (concluding that trial court erred by denying plea to jurisdiction because Commissioner of Education was indispensable party to suit seeking to declare certain chapters of Education Code unconstitutional).

Similar to how a city has the authority to pass ordinances, the UIL has the authority to promulgate rules governing extracurricular activities and interscholastic competition, including the rule at issue, and to impose sanctions for noncompliance. *See* Tex. Educ. Code §§ 33.081, .083, .091, .096, .097, .203. Accordingly, to the extent that sovereign immunity has been waived regarding challenges to UIL rules, which we do not decide, we conclude that the UIL is a jurisdictionally required party to any suit seeking to challenge its rules. *Cf. McLane*, 2020 WL 1073775, at *11-12 (Goodwin, J., concurring) (explaining that agency with authority to adopt rules was "the proper party for appellees' purported rule challenges" and agreeing that appellate court correctly dismissed claims against director of agency in her official capacity for lack of subject-matter jurisdiction); *see also Texas Dep't of Pub. Safety v. Salazar*, 304 S.W.3d 896, 904 (Tex. App.—Austin 2009, no pet.) (observing that agency, not state official, must be party to suit challenging validity of agency rule).

Therefore, we conclude that the trial court lacked jurisdiction over the Plaintiffs' claim seeking a declaration that Rule 443 is unconstitutional and erred by denying the UIL Defendants' plea to the jurisdiction with respect to that claim. Moreover, even if the legislature has waived immunity in this context, the Plaintiffs would not be entitled to replead their claim and name the UIL as a party. *See In re K.G.S.*, No. 14-12-00673-CV, 2014 WL 801127, at *9

34

(Tex. App.—Houston [14th Dist.] Feb. 27, 2014, no pet.) (mem. op.) (explaining that "ability to cure [jurisdictional] defects does not extend to suing new parties" and concluding that remand to allow opportunity to amend was not warranted); *see also Ochoa v. City of Palmview*, No. 13-14-00021-CV, 2014 WL 7404594, at *9 (Tex. App.—Corpus Christi-Edinburg June 19, 2014, no pet.) (mem. op.) (explaining that opportunity to replead to name state actor rather than subdivision of state in ultra vires claim was not warranted); *Southwest Offs. Ass'n*, 319 S.W.3d at 965 (noting that opportunity to amend pleadings does not extend to opportunity to substitute state entity with state actor for claim otherwise barred by sovereign immunity).

For the reasons previously expressed, we sustain the portion of the UIL Defendants' first issue asserting that the trial court erred by denying the portions of their plea to the jurisdiction regarding the Plaintiffs' free-speech claim, equal-protection claim, and request for declaratory relief regarding Rule 443, but we overrule the portion of the UIL Defendants' first issue asserting that the trial court should have granted the portion of their plea asserting that the trial court had no jurisdiction over the Plaintiffs' due-course-of-law claim.

## Temporary Injunction

As set out above, the UIL Defendants contend in their second issue that the trial court erred by granting a temporary injunction in favor of the Plaintiffs, which enjoined the UIL Defendants from enforcing Rule 443 against A.B., enforcing the SEC eligibility determination against A.B., and taking any other actions against the Plaintiffs related to Jennifer's decision to move her family from Coppell to Duncanville.

*Standard of Review*

35

"A temporary injunction is an extraordinary remedy that does not issue as a matter of right." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). "A temporary injunction's purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits." *Id.* To obtain relief, the party applying for a temporary injunction "must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim." *Abbott v. Anti-Defamation League Austin, Sw. & Texoma Regions*, 610 S.W.3d 911, 916 (Tex. 2020) (quoting *Butnaru*, 84 S.W.3d at 204).

Appellate courts review a trial court's decision to grant a temporary injunction for an abuse of discretion. *Butnaru*, 84 S.W.3d at 204. "A trial court abuses its discretion if it . . . acts arbitrarily or unreasonably." *Tanglewood Homes Ass'n, Inc. v. Feldman*, 436 S.W.3d 48, 69 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "[W]hen reviewing such a decision, we must view the evidence in the light most favorable to the trial court's order, indulging every reasonable inference in its favor, and determine whether the order was so arbitrary that it exceeds the bounds of reasonable discretion." *Fox v. Tropical Warehouses, Inc.*, 121 S.W.3d 853, 857 (Tex. App.—Fort Worth 2003, no pet.). Provided that there is some evidence reasonably supporting the trial court's decision, the trial court did not abuse its discretion. *Butnaru*, 84 S.W.3d at 211.

*Cause of Action and Probable Right to Recovery*

For the reasons set out in their first issue, the UIL Defendants contend that the Plaintiffs failed to plead a cause of action against them and a probable right to recovery because the trial court did not have jurisdiction over any of the claims asserted.

36

To meet the elements for a temporary injunction, an applicant is not required to establish that it will ultimately prevail in the suit. *See Transport Co. of Tex. v. Robertson Transp., Inc.*, 261 S.W.2d 549, 552 (Tex. 1953). On the contrary, those elements are met if the applicant "alleg[es] a cause of action and present[s] evidence tending to sustain it." *Fox*, 121 S.W.3d at 857. Appellate courts "will affirm the trial court's decision as long as there are grounds to believe that the claim has merit." *Yarto v. Gilliland*, 287 S.W.3d 83, 94 (Tex. App.—Corpus Christi-Edinburg 2009, no pet.).

Although we have determined above that the trial court did not have jurisdiction over most of the Plaintiffs' claims, we have also concluded that the trial court did have jurisdiction over the Plaintiffs' ultra vires claim asserting that the UIL Defendants violated their due-course-of-law rights and that the Plaintiffs presented evidence in support of that claim. Accordingly, we believe that the trial court reasonably could have concluded that the Plaintiffs had a probable right of recovery on this ultra vires claim. *See Hatten*, 2004 WL 792328, at *3 (concluding "that the Hattens have a probable right to recover on their claim that they have a due process interest under the Texas Constitution" pertaining to stigmatizing effects of eligibility determination and on their claim that they were denied due process).

*Irreparable Injury*

In their appellants' brief, the UIL Defendants assert that the temporary injunction did not prevent an irreparable injury to the Plaintiffs. Essentially, the UIL Defendants contend that any reputational harm is not irreparable because the Plaintiffs can refute the allegation if

37

they prevail on their due-course-of-law claim. Further, the UIL Defendants assert that the inability to play sports is an injury too minor to warrant injunctive relief.[8]

In this case, the Plaintiffs alleged harm to their liberty interests in their reputation and community standing and to Jennifer's liberty interest in the care, control, and custody of her children with the result of those violations being that A.B. could not play sports for Duncanville High School absent injunctive relief. The trial court could have reasonably concluded that the alleged reputational injuries and injuries to family liberty interests would continue pending a trial. Further, the trial court could have reasonably concluded based on the pleadings and evidence that these types of injuries could not be adequately addressed absent injunctive relief. *Cf. Fox*, 121 S.W.3d at 857 (discussing when injury is irreparable). Accordingly, we believe that the trial court reasonably concluded that the Plaintiffs "would likely suffer irreparable injury." *Hatten*, 2004 WL 792328, at *3.

*Status Quo*

"The purpose of a temporary injunction is to preserve the status quo until a trial on the merits." *Fox*, 121 S.W.3d at 857; *see Butnaru*, 84 S.W.3d at 204. "The 'status quo' is the 'last, actual, peaceable, noncontested status which preceded the pending controversy.'" *Texas Ass'n of Bus. v. City of Austin*, 565 S.W.3d 425, 437 (Tex. App.—Austin 2018, pet. denied) (quoting *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) (orig. proceeding)).

On appeal, the UIL Defendants contend that the trial court abused its discretion by granting the temporary injunction because the injunction altered rather than preserved the status

---

[8] As support for this proposition, the UIL Defendants refer to multiple cases from other states and from federal courts that are not binding on this Court. *See Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex. 1993).

38

quo. When making this argument, the UIL Defendants assert that A.B. was never eligible to participate in UIL activities at Duncanville High School. As support, the UIL Defendants highlight that by moving to Duncanville, A.B. was presumed ineligible under Rule 443 unless several requirements were met, including a representative from his previous school's signing a PAPF stating that he did not transfer for athletic purposes, which did not occur in this case. Accordingly, the UIL Defendants contend that the last, peaceable, noncontested status was that A.B. was ineligible to play for Duncanville High School.[9]

The Plaintiffs have argued that A.B. was deemed ineligible and that the UIL Defendants' ultra vires actions prohibited them from being able to establish that the reason for the transfer was not for athletic purposes. *See In re Newton*, 146 S.W.3d at 651 (explaining that "the continuation of illegal conduct cannot be justified as preservation of the status quo"). When confronted with a similar situation in which an athletic director determined that a student's transfer had been made for athletic purposes and in which the DEC and SEC both agreed with the athletic director, this Court upheld a temporary injunction barring the enforcement of those decisions as preserving "the status quo of the subject matter of the suit pending a trial on the merits." *Hatten*, 2004 WL 792328, at *1, *4. One of our sister courts of appeals confronted a

---

[9] The UIL Defendants also assert that enjoining enforcement of Rule 443 cannot maintain the status quo because that Rule is longstanding and because this Court recently explained that enjoining "longstanding requirements" does not maintain the status quo. *See Hughs v. Move Tex. Action Fund*, No. 03-20-00497-CV, 2020 WL 6265520, at *1-2 (Tex. App.—Austin Oct. 23, 2020, order) (per curiam). We find *Hughs* distinguishable. In that case, a nonprofit corporation involved in voter registration asked this Court to reinstate an injunction under Rule of Appellate Procedure 29.3 during the pendency of the appeal. *Id.* at *1. The effect of that injunction would have prevented the Texas Secretary of State from enforcing a physician's certificate requirement for late mail-in ballots, changed longstanding requirements governing late ballots, and risked voter confusion. *Id.* at *1, *2. Although the UIL Defendants are correct that Rule 443 is longstanding, the temporary injunction in this case only enjoined the application of the Rule as to A.B. and therefore does not involve the risk of widespread confusion among a statewide population.

similar athletic ineligibility determination and upheld a trial court's injunction "enjoining the defendants from enforcing the Committee's ruling of ineligibility during the pendency of the suit." *University Interscholastic League v. Green*, 583 S.W.2d 907, 909 (Tex. App.—Corpus Christi 1979, no writ). In light of this authority, we believe that the trial court could have reasonably concluded that the pending controversy concerned A.B.'s eligibility and that the temporary injunction would preserve the status quo. *See In re Motheral*, No. 22-0106 (Tex. Feb. 18, 2022) (orig. proceeding) (denying request for mandamus relief asserting that injunction in this case altered status quo).

For all these reasons, we conclude that the trial court did not abuse its discretion by ordering the temporary injunction and overrule the UIL Defendants' second issue on appeal. *See State ex rel. Abney v. Miller*, 128 S.W.2d 1134, 1135 (Tex. 1939) (noting that "temporary injunction should remain in force pending trial" if there is "one ground" supporting issuance of injunction).[10]

## CONCLUSION

Having overruled the UIL Defendants' second issue and the portion of their first issue as it pertains to the Plaintiffs' due-course-of-law claim, we affirm the portions of the trial court's order granting the temporary injunction and denying the plea to the jurisdiction as to the due-course-of-law claim. Having sustained the remainder of the UIL Defendants' first issue, we

---

[10] The UIL Defendants have submitted a letter to this Court suggesting that the controversy is moot because the basketball season is now over for this year. However, the ruling by the SEC prohibits A.B. from participating in varsity sports for the full academic year, and there are sports with seasons starting after the end of basketball season, including track. Further, A.B. testified during trial that he participated in track at his previous school. Accordingly, we cannot agree that the dispute is moot. Moreover, the UIL Defendants have not otherwise moved to dismiss their appeal.

reverse the portions of the trial court's order denying the plea to the jurisdiction as it pertained to the Plaintiffs' free-speech claim, equal-protection claim, and request for declaratory relief concerning UIL Rule 443 and render judgment dismissing those claims for want of jurisdiction. *See* Tex. R. App. P. 43.2, .3; *Texas Parks & Wildlife Dep't v. Callaway*, 971 S.W.2d 145, 153 (Tex. App.—Austin 1998, no pet.). The case may resume in the trial court absent further action by the parties or by the Texas Supreme Court.

_____

Thomas J. Baker, Justice

Before Justices Goodwin, Baker, and Triana
  Concurring and Dissenting Opinion by Justice Goodwin

Affirmed in Part; Reversed and Rendered in Part

Filed:   May 6, 2022

41